IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBIN SILVER, M.D.; UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT;
and PATRICIA GERRODETTE, *Plaintiffs/Appellees*,

*v.*

PUEBLO DEL SOL WATER COMPANY, an Arizona corporation;
THOMAS BUSCHATZKE, in his official capacity as Director of the
Arizona Department of Water Resources; ARIZONA DEPARTMENT OF
WATER RESOURCES, an agency of the State of Arizona,
*Defendants/Appellants*.

No. 1 CA-CV 14-0811
FILED 11-8-2016

Appeal from the Superior Court in Maricopa County
No.  LC2013-000264-001
LC2013-000271-001
LC2013-000272-001
(Consolidated)

The Honorable Crane McClennan, Judge, Retired

**VACATED; AGENCY ACTION REMANDED**

COUNSEL

Earthjustice, Denver, Colorado
By Heidi J. McIntosh (pro hac vice), Cynthia Christine Tuell
*Counsel for Plaintiff/Appellee Silver*

U.S. Department of Justice Environment & Natural Resources Division,
Washington, D.C.
By John L. Smeltzer, R. Lee Leininger, Katherine J. Barton (pro hac vice)
*Counsel for Plaintiff/Appellee United States of America et al.*

Arizona Center for Law in the Public Interest, Phoenix
By Joy Herr-Cardillo, Timothy M. Hogan
*And*
By David McDevitt
*Counsel for Plaintiff/Appellee Patricia Gerrodette*

Law Office of William P. Sullivan, P.L.L.C., Phoenix
By William P. Sullivan
*Counsel for Defendant/Appellant Pueblo*

Arizona Department of Water Resources, Phoenix
By Kenneth C. Slowinski, Nicole D. Klobas, Janet L. Miller
*Counsel for Defendant/Appellant ADWR et al.*

Law Office of Bruce A. Burke, P.C., Tuscon
By Bruce A. Burke
*Counsel for Amicus Curiae Leshy and Glennon*

Law Offices of Jesse J. Richardson Jr., Morgantown, West Virginia
By Jesse Richardson, Jr. (pro hac vice)
*And*
Snell & Wilmer, L.L.P., Phoenix
By L. William Staudenmaier
*Counsel for Amicus Curiae Water Systems Council*

Fennemore Craig, P.C., Phoenix
By Sean T. Hood, Rhett A. Billingsley
*Counsel for Amicus Curiae Freeport Minerals Corporation*

---

**OPINION**

---

Presiding Judge Jon W. Thompson delivered the opinion of the Court, in which Judge Maurice Portley (Retired) and Judge Patricia K. Norris joined.

---

**T H O M P S O N,** Presiding Judge:

¶1        This is an Adequate Water Supply Designation (AWSD or Designation) case.  We are asked to decide whether the superior court erred by reversing the decision of the Arizona Department of Water Resources (ADWR or Department) approving the application by Pueblo Del Sol Water Company (Pueblo) to allow its development in Cochise County to proceed.  We are also asked to decide whether the Department erred by not considering the unquantified federal water rights reserved to the United States Department of the Interior, Bureau of Land Management (BLM).   Finally, we are asked to determine whether the court erred by awarding the individual plaintiffs, Robin Silver, M.D., and Patricia Gerrodette, attorneys' fees.

¶2        By statute, "Adequate Water" is "[s]ufficient groundwater, surface water or effluent of adequate quality [that] will be *continuously, legally and physically available* to satisfy the water needs for the proposed use for at least one hundred years" and requires that the proposed user has demonstrated the "financial capability . . . to construct the water facilities necessary to make the supply of water available for the proposed use, including a delivery system and any storage facilities or treatment works."  Ariz. Rev. Stat. (A.R.S.) § 45-108(I) (2009) (emphasis added).

¶3        At issue is whether ADWR was required to consider the unquantified federal water rights of BLM in determining whether such water was statutorily available to Pueblo.  Specifically, BLM asserts the Department erred in its "legally available" analysis.   BLM and the individual plaintiffs (collectively, unless identified separately, Plaintiffs) additionally argue Pueblo's proposed pumping will eventually interfere with the San Pedro Riparian National Conservation Area's (Conservation Area) water rights.

¶4        We uphold the Department's interpretation of "legally available," as outlined in its regulation R12-15-718[1], finding the Department's interpretation serves a valid purpose in the context of the entire application process.  The Department's AWSD process, when taken as a whole, adequately considers whether sufficient water will be continuously, legally, and physically available to satisfy the needs of the proposed user for at least one hundred years and insures that the proposed user has the financial capability to construct, store, and deliver that supply of water.  *See* A.R.S. § 45-108(I).   Nevertheless, as we also explain, during the regulatory process, the Department must consider BLM's unquantified federal water rights in determining whether Pueblo has demonstrated the availability of "adequate water" under A.R.S. § 45-108.   Accordingly, we vacate the superior court's judgment in favor of Plaintiffs.

¶5        Further, we remand this matter back to the Department.  On remand the Department shall give educated consideration to the unquantified priority federal reserved water rights of BLM, until such amount is quantified in the General Stream Adjudication for the Gila River System and Source (Gila Adjudication).  After the quantification in the Gila Adjudication, the quantified amount must be included in the AWSD process.  The Department is not required to consider separately the potential impact of proposed pumping on area streams or the San Pedro River.  Further, ADWR is not required to consider the potential impact of proposed pumping on either the San Pedro Riparian National Conservation Area or on the Conservation Area's water right.  We also vacate the $155,861.50 in attorneys' fees awarded to Plaintiffs Silver and Gerrodette.

## FACTUAL AND PROCEDURAL HISTORY

     A.        San Pedro Riparian National Conservation Area

¶6        The San Pedro River flows from northern Mexico through southeastern Arizona for approximately 130 miles until it joins with the Gila River at Winkelman, Arizona. The San Pedro River is one of the few remaining free-flowing and undammed rivers in the desert southwest and

---

[1]        All regulatory citations refer to the Arizona Administrative Code.

it is home to diverse flora and fauna.[2]   The town of Sierra Vista, the military installation Fort Huachuca, and most of the Conservation Area are located within the Sierra Vista Subwatershed.

¶7          In 1988, the United States Congress designated approximately 36 miles of the San Pedro River basin as a national conservation area.   At the same time, Congress created a federal water reserve right for the Conservation Area "in a quantity sufficient to fulfill the purpose" of protecting "the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River."   16 U.S.C. §§ 460xx, (a), (1)(d); Arizona-Idaho Conservation Act of 1988, Pub. L. No. 100-696, 102 Stat. 4571.

¶8          The Department of the Interior, through BLM, is mandated to manage the Conservation Area, and in 1989 BLM asserted a water rights claim in the Gila Adjudication.[3]   At this time, the Gila Adjudication has been active for approximately 40 years.   ADWR is a technical advisor in the Gila Adjudication.

¶9          Since 1989 BLM has filed three amended federal statements of claim for the Conservation Area that cover the full range of surface water and groundwater.   The Conservation Area has both a 1988 priority reserved federal water right and a 1985 state certificate-based water right (CWR No. 33-90103), as well as two or more state-based pending applications.

¶10          BLM's federal reserved rights will be quantified in the Gila Adjudication.   *See* Pub. L. 100-696.   The Gila Adjudication has exclusive jurisdiction to adjudicate the conflicting claims and water rights.   *In re the Gen. Adjudication of all Rights to Use Water in the Gila River Sys. & Source (Gila III)*, 195 Ariz. 411, 416, ¶ 12, 989 P.2d 739, 744 (1999) (holding federal reserved water rights could be invoked to protect groundwater from diversion) (citing to the McCarran Amendment, 43 U.S.C. § 666(a)).

---

[2]     The entire river is not perennially free-flowing; flow in certain sections of the Conservation Area is intermittent.

[3]     This is designated as a contested case in the Gila Adjudication, as "*In re San Pedro Riparian National Conservation Area*, Contested Case No. W1-11-232."

¶11 As explained below, calculating BLM's water rights is not a straightforward mathematical equation. BLM's asserted federal and state water rights do not cover the exact same geographic area. BLM's water right claims do not serve identical purposes or claim identical water sources. Finally, importantly, BLM's federal claim and state water volume claims are not identical.

B. Pueblo Del Sol's Application

¶12 Pueblo is a private water company.[4] Pueblo's service area covers more than 4,000 acres and is located, variously, 4.5 to 5 miles from the San Pedro River. In June 2011, Pueblo filed an application for an AWSD through the year 2032. Such a designation would allow Pueblo to pump groundwater for the Tribute Master Planned Community (Tribute) in Sierra Vista, and other projects, as required by Cochise County for new construction.[5] Tribute could contain up to 6,959 residential units. As planned, the subdivision would proceed in four phases and has water conservation measures, including xeriscape and requirements for water-saving devices in the homes, as well as for potential rainwater harvesting. As of the time of the administrative law judge (ALJ) hearing, Castle & Cooke had invested over $7 million in the Tribute project, exclusive of the cost of the land.

¶13 Pueblo's water is supplied by wells and the area at issue is outside a statutory active water management area.[6] Groundwater is proposed to be the source of the water supply.[7] Pueblo projected its

_____

[4] Castle and Cooke, Arizona, Inc., is Tribute's developer and the owner of Pueblo. The application for the designation is number "[4]0-]700705.000[0]. "

[5] *See* A.R.S. § 11-823(A) (2012) (counties may mandate proof of an adequate water supply through the ADWR before approving a final subdivision plat); Cochise County Subdivision Reg. 408.03.

[6] *See* A.R.S. § 45–411(A) (2009) (establishing four active water management areas: Phoenix, Tucson, Prescott and parts of Pinal County).

[7] The ALJ found "Appellants presented no substantial evidence to show that the water [pumped by Pueblo] is either surface water or subflow and have not shown by clear and convincing evidence that the water is not groundwater."

water demand for that service area, through 2032, would rise from 1,430.85 acre-feet per year (APY) to as much as 4,870.39 APY. The mandatory 3-D hydrology model submitted by Pueblo with its designation application concluded that such a draw would put the groundwater level no greater than 650 feet below the surface after 100 years of pumping. By ADWR regulation, groundwater in the service area may be no greater than 1200 feet below land surface. *See* R12-15-716(B)(2). Pueblo's application also referenced its 1972 public utility certificate of convenience and necessity (CC&N) from the Arizona Corporation Commission.[8]

¶14 BLM, Silver, and Gerrodette each filed objections to the application.[9],[10] ADWR responded to the objections and issued a decision letter and draft decision. The letter stated that after consideration of the objections, ADWR concluded Pueblo's application satisfied the requirements for the AWSD.

¶15 Plaintiffs filed separate appeals and participated in a five-day evidentiary hearing before an ALJ in late 2012. Witnesses included three hydrologists, an engineer with experience in water treatment plant engineering, the senior vice president of Castle & Cooke, and ADWR's Manager of Recharge, and Adequate and Assured Water Supply Programs. The ALJ's 24-page decision made 143 findings of fact and 35 conclusions of law. The ALJ determined that Pueblo had satisfied the continuously, physically and legally available requirements of A.R.S. § 45-108. Ultimately, the ALJ concluded that Plaintiffs had not demonstrated ADWR's decision was contrary to law or issued in error. The ALJ dismissed Plaintiffs' appeals. In April 2013, ADWR adopted the ALJ's decision with some revisions (the Decision).

---

[8] *See* A.R.S. § 40-281, *et seq.* (2011) (certificate of public convenience and necessity).

[9] *See* A.R.S § 45-108.1(A), (B) (2009) (notice, publication, and objections).

[10] ADWR argues that BLM did not specifically assert that Pueblo's wells would be pumping surface water or appropriable subflow and that Plaintiffs are precluded from raising that issue on appeal.

¶16      Plaintiffs filed complaints in superior court seeking judicial review of the Decision.[11]   The complaints were consolidated.   After briefing and argument, the superior court vacated the Decision.   The superior court found ADWR's regulation defining "legal availability," R12-15-718(C), erroneously provided for a decision on this prong based solely on whether the applicant had a CC&N "without any investigation of whether there might be any possible legal constraints on the intended supplies, including ones based on hydrologic conditions or impacts on superior water rights."   The superior court held "ADWR failed to meet its mandatory duty under A.R.S. § 45-108 to ensure that the proposed source of water will, among other things, be legally available for at least 100 years" and, therefore, abused its discretion.   The court stated that, on remand, "in determining whether the amount of water requested by [Pueblo] is legally available, ADWR must consider the existing legal claims and/or rights and determine whether and to what extent those claims and/or rights may affect the availability of the water supplies requested in [Pueblo's] application."

¶17      Under the private attorney general doctrine, the superior court found an upward deviation in the statutory attorneys' fees rate of $75 per hour was appropriate and it awarded legal fees in the amount of $84,210 for Plaintiff Silver and $71,651.50 for Plaintiff Gerrodette.   ADWR and Pueblo appealed the superior court's judgment to this court.   We have jurisdiction pursuant to A.R.S. §§ 12-913 (2016), -2101(A)(1) (2016).

**ISSUES**

¶18      Appellants ADWR and Pueblo assert on appeal:

1.      ADWR properly determined, under Arizona's statutes and Department regulations, that Pueblo satisfied the requirements for an Adequate Water Supply Designation;

2.      ADWR was not required to consider or determine the extent to which existing legal claims and water rights "may affect" the legal availability of groundwater when considering Pueblo's application;

3.      ADWR was not required to consider whether the grant of an adequate water designation could have an

---

[11]    *See* A.R.S. § 12-904 (2015).

8

adverse impact on the instream surface flow of the San Pedro River; and

4.     The superior court abused its discretion in awarding attorneys' fees against Pueblo under the private attorney general doctrine.

¶19     In response, Plaintiffs assert:

1.     ADWR violated A.R.S. § 45-108 and abused its discretion in granting Pueblo an AWSD because the Department failed to make a valid determination of legal availability without first examining any senior legal rights or priorities to the water held by BLM for the conservation of the San Pedro Riparian Area;

2.     Regulation R12-15-718(C), defining legal availability, conflicts with A.R.S. § 45-108 and is unlawful;

3.     ADWR has the authority to determine BLM's unquantified water reserve and the extent to which groundwater is required for Conservation Area purposes;

4.     ADWR has the authority to evaluate the potential adverse impact of Pueblo's proposed groundwater pumping on the Conservation Area's federal reserved water right; and

5.     The superior court properly awarded attorneys' fees to Plaintiffs Silver and Gerrodette.

**STANDARD OF REVIEW**

¶20     On administrative appeal, the superior court "may affirm, reverse, modify or vacate and remand the agency action." A.R.S. § 12–910(E) (2013); *Saldate v. Montgomery*, 228 Ariz. 495, 497-98, ¶ 10, 268 P.3d 1152, 1154-55 (App. 2012). We review "the superior court's judgment to determine whether the record contains evidence to support the judgment and, in doing so, we reach the underlying issue of whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion." *Saldate*, 228 Ariz. at 498, ¶ 10, 268 P.3d at 1155 (internal quotation and citation omitted). We are bound to an administrative agency's factual findings where they are not clearly erroneous. *Whiteco Outdoor Advertising v. City of Tucson*, 193 Ariz. 314, 317, ¶ 7, 972 P.2d 647, 650 (App. 1998) (quoting *Murphy v. Town of Chino*

*Valley*, 163 Ariz. 571, 574, 789 P.2d 1072, 1075 (App. 1989)). When an administrative decision is based on an interpretation of law, we review that decision de novo. *Id.* In construing rules and statutes, we rely on the plain meaning of the language as the best indicator of the drafters' intent. *Fragoso v. Fell*, 210 Ariz. 427, 430, ¶ 7, 111 P.3d 1027, 1030 (App. 2005).

**¶21** When the legislature has not spoken definitively to the issue at hand, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). When the statutory language is admittedly not dispositive, "the Director's expert interpretation deserves considerable deference by the judiciary" and ADWR is "precisely the type of agency to which deference should presumptively be afforded." *Ariz. Water Co. v. Ariz. Dep't of Water Res.*, 208 Ariz. 147, 154-55, ¶¶ 30-33, 91 P.3d 990, 997-98 (2004) (internal quotations and citations omitted) (holding the ADWR director, as the "water czar," has the authority to promulgate a water management plan that did not impose conservation measures directly on all of the water company's end users).

## DISCUSSION

A. Arizona's Water Supply and the Adequate Water Supply Designation

**¶22** Arizona courts recognize that this state's water supply is in "critical" condition. *See U.S. v. Superior Court (Ariz. Dep't of Water Res.)*, 144 Ariz. 265, 270, 697 P.2d 658, 663 (1985). There is insufficient surface water to satisfy the needs of all potential users. *Id.* Disputes over the rights and priority of water users, both surface and groundwater, have made their way to appellate review numerous times.[12] Arizona

---

[12] Such litigation includes: *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 231 Ariz. 8, 289 P.3d 936 (2012) (*Gila VI*); *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 201 Ariz. 307, 35 P.3d 68 (2001) (*Gila V*); *In re the Gen. Adjudication of all Rights to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 9 P.3d 1069 (2000) (*Gila IV*); *In re the Gen. Adjudication of all Rights to Use Water in the Gila River Sys. & Source*, 195 Ariz. 411, 989 P.2d 739 (1999) (*Gila III*); *In re the Gen. Adjudication of all Rights to Use Water in the Gila River Sys. & Source*, 175 Ariz. 382, 857 P.2d 1236 (1993) (*Gila II*); *In re Rights to the Use of the Gila*

distinguishes between surface water and groundwater, even where surface and ground water may be hydrologically connected. John D. Leshy & James Belanger, Arizona Law Where Ground and Surface Water Meet, 20 Ariz. St. L.J. 657, 659 (1988); *see also Gila III*, 195 Ariz. at 415-16, ¶¶ 9-10, 989 P.2d at 743-44 (discussing the "hydrological reality" that pumping groundwater may have an impact on surface water).

¶23　　In Arizona, surface water and sub-flow are subject to the doctrine of prior appropriation. *See* A.R.S. §§ 45–141 (2003), -151 (2003), –251(7) (2003); *Gila IV*, 198 Ariz. at 334, ¶¶ 3–5, 9 P.3d at 1073. An appropriator acquires a legal right to water by putting it to a beneficial use. A.R.S. § 45–141(B). Generally, prior appropriation is a seniority system. According to state law, the person "first appropriating the water shall have the better right." A.R.S. § 45–151(A). This seniority system becomes important in times of shortage because senior rights holders may take their entire allotments of water before junior appropriators receive any at all. A.R.S. § 45–175 (2003).

¶24　　Arizona groundwater is regulated by the Department and governed by the doctrine of reasonable use. A.R.S. §§ 45–102 (2003), -103 (2003), -105 (2012), -451 (2012), -453 (2003). The Arizona Groundwater Code was created to address concerns about the depletion of groundwater. *See* A.R.S. §§ 45–401 to –704 (2003), 1980 Ariz. Sess. Laws, ch. 1 (4th Spec. Sess.). "The Code was designed to protect the state's economy and welfare, and to 'provide a framework for the comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater in this state.'" *Ariz. Water Co.*, 208 Ariz. at 148, ¶ 3, 91 P.3d at 991 (quoting A.R.S. § 45–401(B) (2003)).

¶25　　Generally speaking, "Arizona law does not recognize a real property interest in the potential future use of groundwater that has never been captured and applied to reasonable use." *Davis v. Agua Sierra Res., L.L.C.*, 220 Ariz. 108, 112, ¶ 24, 203 P.3d 506, 510 (2009) (citing A.R.S. §§ 45–453, –541 to –554; Leshy & Belanger, *supra*, at 715–16 (discussing Ground Management Act's impact on reasonable use doctrine)). One exception to that rule, at least, concerns federal water rights reserved for the use of Indians on Indian Reservations. *See Gila III*, 195 Ariz. at 420, ¶

---

*River*, 171 Ariz. 230, 830 P.2d 442 (1992) (*Gila I*); *United States v. Superior Court*, 144 Ariz. 265, 697 P.2d 658 (1985).

31, 989 P.2d at 748 ("We decide this issue in the abstract . . . We do not, however, decide that any particular federal reservation, Indian or otherwise, has a reserved right to groundwater. A reserved right to groundwater may only be found where other waters are inadequate to accomplish the purpose of a reservation . . . inevitably fact-intensive inquiries that must be made on a reservation-by-reservation basis.") (citing *United States v. New Mexico*, 438 U.S. 696, 700 (1978)).

¶26        Since *Winters v. United States*, 207 U.S. 564 (1908), the Supreme Court has held that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (citations omitted). Federal water rights are subordinate to rights acquired under state law prior to creation of the reservation, but senior to the claims of future state appropriators. *Id.*; *Gila V*, 201 Ariz. at 310-11, ¶ 6, 35 P.3d at 71-72. Federal reserved water right holders can claim priority based on the date of establishment of the federal reservation. *Gila VI*, 231 Ariz. at 13, ¶ 18, 289 P.3d at 941. "In this sense, a federally reserved water right is preemptive. Its creation is not dependent on beneficial use, and it retains priority despite non-use." *Gila V*, 201 Ariz. at 311, 35 P.3d at 72.

¶27        Under the current water management system, a developer seeking to develop a subdivision in Arizona outside of an active water management area must show: (1) by a water report from ADWR, that the developer itself has an adequate water supply, or (2) that the developer has a written commitment from a city, town, or private water company that the water supply company has an adequate water supply, as designated by ADWR. A.R.S. § 45-108(A), (B).[13,14] One important purpose

---

[13]        BLM in support of its argument cites to R12-15-718(D), (E)-(N), regulations relevant to developers inside an Active Management Area as to users of surface water, [Central Arizona Project] water, effluent, water exchange agreement water, long-term storage water credits, water from storage or Colorado River water. An AMA is a designated area experiencing severe groundwater depletion. The current matter is not in an AMA and such regulations are inapplicable.

[14]        In 2016, Senate Bills 1400 and 1268 were passed by the Arizona Legislature. SB 1268, 52nd Leg., 2nd Reg. Sess. (Ariz. 2016); SB 1400, 52nd Leg., 2nd Reg. Sess. (Ariz. 2016). Senate Bills 1268 and 1400 would have

of the adequacy program is to make real estate buyers aware of any potential water supply limitations. It is the Director's duty "to evaluate the proposed source of water for the subdivision to determine whether there is an adequate water supply for the subdivision." A.R.S. § 45-108(B).

¶28 By statute "adequate water supply," A.R.S. § 45-108(I), is defined as meaning both of the following:

> 1. Sufficient groundwater, surface water or effluent of adequate quality will be *continuously, legally and physically available* to satisfy the water needs of the proposed use for at least one hundred years.
>
> 2. The financial capability has been demonstrated to construct the water facilities necessary to make the supply of water available for the proposed use, including a delivery system and any storage facilities or treatment works. The director may accept evidence of the construction assurances required by § 9-463.01, 11-823 or 32-2181 to satisfy this requirement.

(Emphasis added.)

¶29 The statute does not define what "continuously, legally and physically available" means, but ADWR has promulgated regulation R12-15-716[15] to define "physical availability," R12-15-717[16] to define "continuous availability," and R12-15-718[17] to define "legal availability."

---

allowed municipalities located in counties that had adopted an adequate water supply ordinance to opt out of the ordinance under certain conditions. The governor vetoed both bills.

[15]     R12-15-716. Physical Availability

A. The volume of a proposed source of water that is physically available to an applicant for a determination of assured water supply or a determination of adequate water supply is the amount determined by the Director to be physically available pursuant to subsections (B) through (L) of this Section.

B. If the proposed source is groundwater, the applicant shall submit a hydrologic study, using a method of analysis approved by the Director, that accurately describes the hydrology of the affected area. Except as provided in subsection (D) of this Section, the Director shall determine that the proposed volume of groundwater will be physically available for the proposed use if both of the following apply:

1. The groundwater will be withdrawn as follows:

a. Except as provided in subsection (B)(1)(b) of this Section, from wells owned by the applicant . . . that are located within the service area of the applicant . . . that the Director determines are likely to be constructed for future uses of the applicant. . ..

…

2. Except as provided in subsection (C) of this Section, the groundwater will be withdrawn from depths that do not exceed the applicable maximum 100-year depth-to-static water level according to the following:

…

c. Developments outside AMAs, except dry lot developments 1200 feet below land surface. . .

…

3. The Director shall calculate the projected 100-year depth-to-static water level by adding the following for the area where groundwater withdrawals are proposed to occur:

a. The depth-to-static water level on the date of application.

b. The projected declines caused by existing uses, using the projected decline in the 100-year depth-to-static water level during the 100-year period after the date of application, calculated using records of declines for the maximum period of time for which records are available up to 25 calendar years before the date of application. If evidence is provided to the Director of likely changes in pumpage patterns and aquifer conditions, as opposed to those patterns and conditions occurring historically, the Director may determine projected declines using a model rather than evidence of past declines.

c. The projected decline in the depth-to-static water level during the 100-year period after the date of application, calculated by adding the projected decline from each of the

14

following that are not accounted for in subsection (B)(3)(b) of this Section:

i. The estimated water demand of issued certificates and water reports that will be met with groundwater or stored water recovered outside the area of impact of the stored water, not including the demand of subdivided lots included in abandoned plats;

ii. The estimated water demand of designations that will be met with groundwater or stored water recovered outside the area of impact of the stored water; and

iii. The groundwater reserved for developments for which the Director has issued an analysis pursuant to R12-15-703 or R12-15-712.

d. The projected decline in depth-to-static water level that the Director projects will result from the applicant's proposed use over a 100-year period.

…

E. Subject to subsection (L) of this Section, if the proposed source of water is surface water, other than CAP water, or Colorado River water, the Director shall determine the annual volume of water that is physically available for the proposed use, taking into consideration the priority date of the right or claim, by calculating 120% of the firm yield of the proposed source at the point of diversion as limited by the capacity of the diversion works; except that if the applicant demonstrates that an alternative source of water will be physically available during times of shortage in the proposed surface water supply, the Director shall determine the annual volume of water available by calculating 100% of the median flow of the proposed source at the point of diversion as limited by the capacity of the diversion works. The Director shall determine the firm yield or median flow as follows:

1. By calculating the firm yield or median flow at the point of diversion based on at least 20 calendar years of flow records from the point of diversion, unless 20 calendar years of records are unavailable and the Director determines that a shorter period of record provides information necessary to determine the firm yield or median flow; or

15

2. By calculating the firm yield or median flow at the point of diversion using a hydrologic model that projects the firm yield or median flow, taking into account at least 20 calendar years of historic river flows, changes in reservoir storage facilities, and projected changes in water demand. The yield available to any applicant may be composed of rights to stored water, direct diversion, or normal flow rights. If the permit for the water right was issued less than five years before the date of application, the Director shall require the applicant to submit evidence, as applicable, in accordance with this subsection.

…

K. In the case of two or more pending, conflicting, complete and correct applications for determinations of assured water supply or determinations of adequate water supply, the Director shall give priority to the application with the earliest priority date . . ..

R12-15-717. Continuous Availability

A. The Director shall determine that an applicant will have sufficient supplies of water that will be continuously available for 100 years if the applicant submits sufficient evidence that adequate delivery, storage, and treatment works will be in place in a timely manner to make the water available to the applicant or the applicant's customers for 100 years and the applicant meets any applicable requirements in subsections (B) through (G) of this Section.

B. If the proposed source of water is groundwater, the applicant shall demonstrate that wells of a sufficient capacity will be constructed in a timely manner to serve the proposed uses on a continuous basis for 100 years.

R12-15-718. Legal Availability

A. The Director shall determine that an applicant will have sufficient supplies of water that will be legally available for at least 100 years if the applicant submits all of the applicable information required by this Section.

B.     ADWR Adequate Water Supply Analysis

**¶30**     Plaintiffs assert ADWR could not make a valid determination of legal availability without first examining any senior legal rights held by BLM for the benefit of the Conservation Area. Plaintiffs, therefore, seek a finding that R12-15-718 defining legal availability conflicts with A.R.S. § 45-108 and is unlawful. We disagree, finding the Department's interpretation of legally available in the context of "continuously, legally and physically available" serves a valid purpose when the three consecutive regulations and A.R.S. § 45-108(I)(2) are read together. But, as we also explain, R12-15-718 does not exempt the Department from having to consider BLM's reserved water right even though that right has not yet been quantified.

**¶31**     At the outset, we must clarify ADWR's two-step determination under the legal availability prong of A.R.S. § 45-108(I)(1). First, the Department must find the water company has a reasonable and beneficial use for the water. A.R.S. § 45-453. Second, the water company must have a legal means of delivering that water as evidenced by a certificate of convenience and necessity from the Corporation Commission.[18]     *See* A.R.S. § 45-108(I)(2); R12-15-718(C).     ADWR

---

…

C. If the applicant is a private water company applying for a designation, the applicant shall submit evidence that the applicant has a certificate of convenience and necessity approved by the Arizona Corporation Commission, or has been issued an order preliminary by the Arizona Corporation Commission for a certificate of convenience and necessity, authorizing the applicant to serve the proposed use.

[18]     Arizona's public policy has long been that public service corporations, such as water companies, are regulated monopolies. *James P. Paul Water Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 426, 429, 671 P.2d 404, 407 (1983). The Corporation Commission is statutorily required to investigate all applicants for a certificate of public convenience and necessity for a given area, and to issue a certificate only upon a showing that the issuance to the applicant serves the public interest. A.R.S. §§ 40-281, –285; *see Pac. Greyhound Lines v. Sun Valley Bus Lines*, 70 Ariz. 65, 68,

determined that Pueblo, in developing Tribute, had both a 1972 CC&N and a reasonable and beneficial use for the water. On that basis, ADWR found Pueblo satisfied the Department's "legal availability" requirement. The ALJ agreed and affirmed the Department's finding. We likewise agree.

¶32 Importantly, the Director's duty to determine whether adequate water is available, *see supra* ¶ 29, is significantly more involved than determining mere legal availability. Not only is the process of determining whether there is adequate water available complicated, but it can also be time consuming, taking a year or more.[19,20] The Director must consider the other elements comprising the definition of "adequate water supply." The physical availability prong requires, for example, mandatory 3-D hydrology modeling to examine the current water demand, the committed water demand, and the projected demands of the applicant and the other users.[21] In fact, the physical availability analysis

---

216 P.2d 404, 406 (1950). "Once granted, the certificate confers upon its holder an exclusive right to provide the relevant service for as long as the grantee can provide adequate service at a reasonable rate. If a certificate of convenience and necessity within our system of regulated monopoly means anything, it means that its holder has the right to an opportunity to adequately provide the service it was certified to provide." *James P. Paul Water Co.*, 137 Ariz. at 429, 671 P.2d at 407.

[19] The superior court looked solely at the legal availability prong and stated "ADWR based this finding solely on the fact that [Pueblo] has a CC&N issued by the ACC in 1972. ADWR considered no other factors in reaching its finding . . . without taking into account BLM's [federal reserved water right] in [the Conservation Area] and the state-law instream flow water right possessed by the BLM." Analyzing the legal availability prong in a vacuum is problematic. The legal availability analysis can only be appreciated in the context of the entire designation process.

[20] ADWR regulations cite a goal of having AWSD completed within 210 days.

[21] The Pueblo model was reviewed by a Department hydrologist and was returned once for revisions.

done by Pueblo required consideration of the water already committed to approximately 200 area users.[22]

¶33　　　In addition to satisfying the legal availability requirement, the ALJ found ADWR also considered Pueblo's proposed source of the water, the current demand from other users, the committed demand to other users, and the projected demand of other users.[23]　The record supports this finding.　The record further supports the finding that Pueblo demonstrated that sufficient water would be continuously available for 100 years.

¶34　　　BLM argues that ADWR's focus on the issuance of an CC&N is contrary to the plain language of the statute, which, it alleges, "clearly requires an examination of potentially conflicting water rights."　We do not find that the plain language of A.R.S. § 45-108(I) requires the interpretation of legal availability put forward by BLM.

¶35　　　The Department has determined legal availability to mean, under R12-15-718(C), a private water company that has a permanent or preliminary certificate of convenience and necessity from the Arizona Corporation Commission.　ADWR's interpretation of statutory requirements "should be given great weight in the absence of clear statutory guidance to the contrary." *Ariz. Water Co.*, 208 Ariz. at 154, ¶ 30, 91 P.3d at 997.　Because "[t]he legislature mandated that the Director be an expert in the field," and gave him "broad powers to achieve groundwater conservation," and there being no statutory guidance to the contrary, we accept his interpretation of A.R.S. § 45-108. *Id.* at 155, ¶ 31, 91 P.3d at 998 (internal citation omitted).

---

[22]　　　*See* ADWR Demand Tables.

[23]　　　"Committed demand" is the 100-year water demand at build-out of all recorded lots not yet being served water within the service area.　R12-15-701(24).　"Current demand" is the 100-year water demand for existing uses in the service area as based on the annual report for the previous calendar year.　R12-15-701(26).　"Projected demand" is the 100-year water demand at build-out, not including committed demand or current demand, of customers and/or plats reasonably projected to be approved in the service area.　R12-15-701(57).

¶36        We hold the Department's requirement that a private water company have a CC&N is in keeping with the statutory requirement of A.R.S. § 45-108(I)(2) that the utility be sufficiently financially viable to deliver, store and treat such water and, as such, serves the consumer protection purposes of the statute. Thus, R12-15-718 is not in conflict with A.R.S. § 45-108.

¶37        Our conclusion endorsing ADWR's "legal availability" analysis, however, does not excuse ADWR from considering BLM's priority federal water claim.

### C.     BLM's Priority Federal Claim

¶38        BLM asserts on appeal that ADWR should consider its priority water right and either quantify it or take its claim at face value. ADWR argues that while the federal government has a reserved water right, the amount is undetermined and ADWR is prohibited from considering that water right because the Gila Adjudication is the exclusive forum to resolve that question. Under the regulatory scheme, we agree with BLM -- ADWR must "consider" BLM's currently unquantified water rights with a recognition that the federal water right will have priority over any state-based water rights vested after 1988. *See Cappaert*, 426 U.S. at 138-39; *Gila VI*, 231 Ariz. at 13, ¶ 18, 289 P.3d at 941.

¶39        In ruling in favor of BLM on this issue, we find not only that ADWR has the legal authority to consider BLM's federal claim, it has a duty to do so. In fact, R12-15-716(B) states:

> 3. *The Director shall calculate* the projected 100-year depth-to-static water level by adding the following for the area where groundwater withdrawals are proposed to occur:
> a. The depth-to-static water level on the date of application.
> b. *The projected declines caused by existing uses*, using the projected decline in the 100-year depth-to-static water level during the 100-year period after the date of application . . ..

(Emphasis added.) The water supporting the Conservation Area is certainly an "existing use." We see nothing under this regulation which defines "existing use" to exclude federal water claims. Rather, requiring the consideration of BLM's federal reserved water right fulfills the intent of the groundwater management statutes to protect Arizona's economy and welfare, and to provide a comprehensive framework for the management and regulation of groundwater, without compromising

Congress's intent to preserve the Conservation Area. *See Ariz. Water Co.*, 208 Ariz. at 148, ¶ 3, 91 P.3d at 991.

¶40        ADWR itself need not, however, specifically quantify BLM's water rights.[24,25] That determination is rightly and exclusively the domain of the Gila Adjudication. *See Gila III*, 195 Ariz. at 414, ¶ 2, 989 P.2d at 742 ("The purpose of a comprehensive general stream adjudication is to determine the nature, extent and relative priority of the water rights of all who use the water of a river system and source.") (internal quotation marks omitted) (citing A.R.S. §§ 45–251(2), –252(A));[26] *U.S. v. Superior Court (San Carlos Apache Tribe)*, 144 Ariz. 265, 270, 697 P.2d 658, 663 (1985) ("Since there is not enough water to meet everyone's demands, a determination of priorities and a quantification of the water rights accompanying those priorities must be made. Obviously, such a task can be accomplished only in a single proceeding in which all substantial claimants are before the court so that all claims may be examined, priorities determined, and allocations made."). The Gila Adjudication will determine whether BLM has a reserved right to the groundwater "where other waters are inadequate to accomplish the purpose of a

---

[24]        At oral argument, ADWR stated its belief that the superior court's judgment required it to quantify BLM's water rights.

[25]        Rather than doing an independent analysis, BLM argues that ADWR could accept its water claims at "face value" when considering whether there will be adequate water for applicants. To this end BLM cites, by analogy, R12-15-718(E)(1) and (3). Because those regulations specifically require applicants to provide proof of a valid water right when using surface water, they are not helpful here. Nor do we find ADWR must accept BLM's federal claims at face value.

[26]        Section 45-252(A) reads:

> One or more water users upon a river system and source, the water rights of which have not been previously adjudicated under this article and administered by the director of water resources, or the state of Arizona upon the request of any state agency other than the department of water resources may file a petition to have determined in a general adjudication the nature, extent and relative priority of the water rights of all persons in the river system and source.

reservation," *Gila III*, 195 Ariz. at 420, ¶ 31, 989 P.2d at 748, and what the minimum amount will be "to accomplish the purpose of the reservation," *Cappaert*, 426 U.S. at 138.

¶41        ADWR protests that requiring it to consider BLM's claim will be time consuming and arduous.   The fact that the consideration process may take time and effort does not exempt ADWR from having to do so.  We agree with BLM that considering BLM's claim does not amount to adjudicating the claim but is, rather, an "exercise of agency discretion" in regulating adequate water supply designations.   The record shows that ADWR, as a technical advisor in the Gila Adjudication, is aware both of the claims to water made by BLM and the potential calculation errors or offsets the Gila Adjudication may employ in quantifying the "minimum necessary" to fulfill BLM's purpose.[27]  The Department is knowledgeable as to the range of BLM's federal claims and the future status of the aquifer.

¶42        The Department, therefore, must use its knowledge and expertise to look at designation applications with an educated eye as to what the Gila Adjudication may eventually determine to be BLM's water right and, taking that conclusion into consideration, determine whether there is "adequate water" under A.R.S. § 45-108 for applicants.[28]   BLM's

---

[27]        On the larger scale, the Department knows, for example, that the United States Geologic Service (USGS) model and resulting capture map used by BLM do not include the effects of groundwater recharge from the Sierra Vista Water Reclamation Facility (WRF), but which were included in Pueblo's hydrology model.  The ALJ heard testimony that based on current data this WRF will recharge approximately 75% of the water Pueblo will draw from the aquifer and that it will have a positive recharge effect on the San Pedro river flow over a wide area.  The Department is certainly aware that Sierra Vista plans to build three additional permanent wastewater treatment facilities, one of which will be dedicated to Tribute and all of which will contribute to local water recharge, but that these facilities were not included in Pueblo's hydrology model.  On a smaller scale, the Department knows that the USGS model used hypothetical wells not intended to show the actual effect of Pueblo's wells, and that it included wells pumping, day in and day out, 24 hours a day, season after season, which is not realistic.

[28]        Both Tribute and the Tribute water reclamation facilities will proceed in four stages. These stages will allow ADWR to reconsider designations, as needed.   ADWR is required to review designations of

claim, while potentially expansive, is not infinite and does not necessarily conflict with development in the area.[29]   The Gila Adjudication is the correct venue to suss out the minimum amount of water that will serve BLM's purpose.  *See Gila III,* 195 Ariz. at 421-22, ¶ 38, 989 P.2d at 749-50 ("We do not . . . read the case law to require a zero-impact standard of protection for federal reserved rights . . . only that amount of water necessary to fulfill the purpose of the reservation, no more.").   For these

---

adequate water supply every 15 years to determine whether they should be modified or revoked.  R12-15-715(C).  The director has the authority to revoke a designation of adequate water supply if the water supply may become inadequate.  A.R.S. § 45-108(F); R12-15-715.

[29]     BLM's federal claim includes an average stream flow for the San Pedro River of 11,150 AFY.  BLM also claims up to 20,800 AFY in flood flows and claims from other surface water point sources such as ponds, seeps and small lakes.  BLM's 1985 certified instream flow is for 14,694 AFY.

By order dated July 14, 2010, the Special Master in the Gila Adjudication directed the Department to evaluate the methodologies used by BLM to quantify its federal and state claims.   One concern of the Special Master's was the interaction of BLM's Certificate of Water Right under state law and BLM's federal reserved water rights for the Conservation Area.  The Special Master found that CWR No. 90103.0000 "must be considered a water right available to the United States to serve the federal purposes of the [Conservation Area], and . . . The beneficial uses of CWR No. 90103.0000 are distinct and separate uses that partially, but not fully, fulfill the federal purposes of the [Conservation Area] to the extent water is required."   The Special Master also found that while the federal reserved right outlined by Congress had a priority date of 1988, the land later acquired by BLM and added to the Conservation Area "is the date of their incorporation within the conservation area."   A 2012 report issued by ADWR explores the methodologies BLM used in substantiating its claims.  *See Report Concerning Federal Reserved Water Rights Claims for SPRNCA In re: The General Adjudication of the Gila River System and Source* (May 2012).

reasons we hold that ADWR must "consider" BLM's currently unquantified reserved federal water rights as directed in this opinion.[30]

      D.     Must ADWR Consider the Impact of Pumping?

**¶43**      Plaintiffs argue that Pueblo's proposed pumping will eventually interfere with the Conservation Area's water rights and local surface water and, as such, should be taken into consideration when determining whether Pueblo satisfied the requirements for an adequate water supply designation under A.R.S. § 45-108. The Department argues, and we agree, that ADWR is not required to separately consider the impact of pumping on the Conservation Area or local surface or groundwater except as it may affect the statutory considerations we have directed above. An administrative agency has only the powers granted to it by the legislature. *Eaton v. AHCCCS*, 206 Ariz. 430, 436, ¶ 23, 79 P.3d 1044, 1050 (App. 2003). Neither A.R.S. § 45-108 nor any other law in effect requires pumping impact analysis and the Director of ADWR states its policy is to not consider the impact of pumping on streams.[31] We find no compelling reason to impose such a requirement on ADWR for the purpose of determining whether an applicant meets the requirements for an adequate water supply designation.

---

[30]     ADWR asserts that BLM has waived any issues related to its state certified water claim or in stream flow waters because BLM failed to raise the issue with specificity in its objections to the Department. ADWR should consider, however, those rights in determining BLM's net demand under both state and federal water rights given the Special Master's indication that the state water rights may "partially, but not fully, fulfill the federal purposes of the [Conservation Area] to the extent water is required."

[31]     In 2007, the legislature enacted A.R.S. § 45-6401, which authorized an election in the Upper San Pedro River Watershed to determine whether an Upper San Pedro Water District (USPWD) should be established. If such a water district had been established, then under A.R.S. § 45-108.04, an applicant for a water supply determination in that area would have been required to demonstrate its projected water use was consistent with USPWD goals, including maintaining the aquifer and base flow conditions as provided for in A.R.S. § 45-6403(B). An election was held in 2010 and the establishment of the district was defeated.

## ATTORNEYS' FEES BELOW AND ON APPEAL

**¶44**       On appeal, Pueblo asserts that the superior court abused its discretion in awarding $155,861.50 in attorneys' fees to Plaintiffs Silver and Gerrodette. Pueblo asserts that the private attorney general doctrine is not applicable here, and even if it were, a portion of the fees was non-recoverable. Pueblo also asserts the superior court erred in granting an upward deviation from the $75 hourly rate.

**¶45**       The purpose of the private attorney general doctrine is "to promote vindication of important public rights." *Arnold v. Ariz. Dep't of Health Servs.*, 160 Ariz. 593, 609, 775 P.2d 521, 537 (1989) (internal quotation and citation omitted). The doctrine "is an equitable rule which permits courts in their discretion to award attorneys' fees to a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Id.* (citations omitted).

**¶46**       Because we are vacating the superior court's judgment, we also vacate the fee award to Plaintiffs. In this opinion, while we have rejected ADWR's assertion that it need not consider BLM's unquantified federal water claim, we have also rejected the Plaintiffs' argument that ADWR must consider the broadest version of BLM's water claims, and make especial analysis of the impact of Pueblo's pumping on the conservation area's water rights.

**¶47**       A determination of whether the rights Plaintiffs contended for are vindicated must await the ultimate judgment in this matter and a review of the contours of that judgment. At that time all fees to judgment, including the current appellate fees, may be sought.

## CONCLUSION

¶**48**        For the above stated reasons, the superior court's decision is vacated.  The superior court erred in its consideration of the definition of legal availability and in requiring ADWR to consider the impact on the Conservation Area.  We direct ADWR that it must take into consideration BLM's water rights claims.  The fee award below is vacated.



AMY M. WOOD • Clerk of the Court
FILED:  AA