IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

ROBIN SILVER, M.D.; UNITED STATES OF AMERICA, U.S. DEPARTMENT OF
THE INTERIOR, BUREAU OF LAND MANAGEMENT; AND PATRICIA
GERRODETTE,
*Plaintiffs/Appellees,*

*v.*

PUEBLO DEL SOL WATER COMPANY, AN ARIZONA CORPORATION; THOMAS
BUSCHATZKE, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE ARIZONA
DEPARTMENT OF WATER RESOURCES; ARIZONA DEPARTMENT OF WATER
RESOURCES, AN AGENCY OF THE STATE OF ARIZONA,
*Defendants/Appellants.*

No. CV-16-0294-PR
Filed August 9, 2018

Appeal from the Superior Court in Maricopa County
The Honorable Crane McClennen, Judge
Nos. LC2013-000264
LC2013-000271
LC2013-000272
(Consolidated)
**REVERSED**

Opinion of the Court of Appeals, Division One
241 Ariz. 131 (App. 2016)
**VACATED**

COUNSEL:

Timothy M. Hogan, Arizona Center for Law in the Public Interest, Phoenix;
and Heidi J. McIntosh (argued), Earthjustice, Denver, CO, Attorneys for
Robin Silver, M.D.

F. Patrick Barry, Katherine W. Hazard (argued), United States Department
of Justice, Washington, DC, Attorneys for United States of America, U.S.

Department of the Interior, Bureau of Land Management

Daniel J. Adelman, Arizona Center for Law in the Public Interest, Phoenix; and Joy E. Herr-Cardillo, University of Arizona, James E. Rogers College of Law, Tucson, Attorneys for Patricia Gerrodette

William P. Sullivan (argued), Law Offices of William P. Sullivan P.L.L.C., Phoenix, Attorneys for Pueblo Del Sol Water Company

Kenneth C. Slowinski, Nicole D. Klobas, Janet L. Miller (argued), Arizona Department of Water Resources, Phoenix, Attorneys for Thomas Buschatzke and Arizona Department of Water Resources

Jesse Richardson, Jr., Law Offices of Jesse J. Richardson, Jr., Morgantown, WV; and L. William Staudenmaier, Snell & Wilmer L.L.P., Phoenix, Attorneys for Amicus Curiae Water Systems Council

_____

JUSTICE LOPEZ authored the opinion of the Court, in which VICE CHIEF JUSTICE BRUTINEL, and JUSTICES TIMMER and GOULD joined. CHIEF JUSTICE BALES and JUSTICE BOLICK authored separate opinions concurring in part and dissenting in part, in which JUSTICE PELANDER joined. JUSTICE PELANDER issued an opinion concurring in the partially dissenting opinions of CHIEF JUSTICE BALES and JUSTICE BOLICK.

_____

JUSTICE LOPEZ, opinion of the Court:

¶1        The issue in this case is whether the Arizona Department of Water Resources ("ADWR") is required to consider unquantified federal reserved water rights when it determines whether a developer has an adequate water supply for purposes of A.R.S. § 45-108. We hold that the statute does not require ADWR to do so.

## I.  FACTS AND PROCEDURAL HISTORY

¶2        This case arises out of a 2013 adequate water supply designation by ADWR approving Pueblo Del Sol Water Company's ("Pueblo") application to supply water to a proposed development in Cochise County. Pueblo was formed in 1972 and received a Certificate of Convenience and Necessity ("CC&N") from the Arizona Corporation

Commission ("Commission") that year. Pueblo's service area covers approximately 4800 acres of land in Cochise County. Castle & Cooke, Inc., which owns Pueblo, seeks to build a mixed-use development called "Tribute," which would include about 7000 commercial and residential units near Sierra Vista. The proposed development site is located approximately five miles from the San Pedro River and is outside a statutory active management area ("AMA"). *See* A.R.S. § 45-411(A) (identifying Arizona's AMAs).

¶3 In 1988, Congress established the San Pedro Riparian National Conservation Area ("SPRNCA") and delegated management of SPRNCA to the Secretary of the Interior. *See* 16 U.S.C. § 460xx-1(a). The Bureau of Land Management ("BLM") manages national conservation areas, including SPRNCA, on behalf of the U.S. Department of the Interior. Congress also created an accompanying federal reserved water right to fulfill SPRNCA's conservation purpose and ordered the Secretary of the Interior to "file a claim for the quantification of such rights in an appropriate stream adjudication." *Id.* § 460xx-1(d). The right has a priority date of November 18, 1988, for purposes of establishing the federal government's priority in the seniority system that governs competing appropriation rights. *Id.* In addition to its federal reserved water right, SPRNCA has a 1985 state certificate-based surface water right and other pending state-based applications. SPRNCA's federal reserved water right will eventually be quantified in the Gila River General Stream Adjudication (the "Gila Adjudication") but remains unquantified after nearly thirty years of litigation.

¶4 Pueblo, which plans to provide the vast majority of Tribute's water services, calculated that it would need to increase its annual groundwater pumping from about 1430 acre-feet to 4870 acre-feet to meet Tribute's needs. When Pueblo applied to ADWR for an adequate water supply designation, BLM, Robin Silver, and Patricia Gerrodette (collectively, "Plaintiffs") objected pursuant to A.R.S. § 45-108.01(B). ADWR then issued a draft decision and order finding that Pueblo's application satisfied the "adequate water supply" requirements under A.R.S. § 45-108(I) by showing that water would be "continuously, legally and physically available" to satisfy Tribute's water needs "for at least one hundred years" and that Pueblo possesses "financial capability" to construct necessary water facilities. Plaintiffs appealed, arguing, among other things, that the increase in Pueblo's groundwater pumping would

3

affect the flow of the San Pedro River and would therefore conflict with BLM's federal reserved water right.

¶5            The administrative law judge ("ALJ") agreed with ADWR, concluding that Pueblo met its burden of demonstrating that water would be continuously, legally, and physically available.  ADWR then issued an order affirming the ALJ's decision.  Plaintiffs filed complaints for judicial review, which the superior court consolidated, but did not challenge the ALJ and ADWR's finding that Pueblo met the physical availability requirement.

¶6            The superior court vacated ADWR's decision, ruling that the agency erred in concluding that Pueblo's water supply is "legally available."  The court reasoned that ADWR was required to consider potential and existing legal claims that may affect the availability of the water supply, including BLM's unquantified federal water right.  The court also awarded Silver and Gerrodette attorney fees under A.R.S. § 12-348 and the private attorney general doctrine.

¶7            The court of appeals vacated the superior court's decision and remanded the matter to ADWR.  *Silver v. Pueblo Del Sol Water Co.*, 241 Ariz. 131, 134 ¶¶ 4–5 (App. 2016).  The court held that the superior court erred in requiring ADWR to consider BLM's unquantified water right under ADWR's legal availability regulation, Arizona Administrative Code R12-15-718, and found that regulation consistent with A.R.S. § 45-108(I).  *Id.* at 141–42 ¶¶ 36–37.  However, the court also concluded that, pursuant to ADWR's physical availability regulation, A.A.C. R12-15-716, ADWR "must use its knowledge and expertise" and apply its "educated eye as to what the Gila Adjudication may eventually determine to be BLM's water right" to consider the impact of BLM's unquantified water right on Pueblo's water supply.  *Id.* at 143–44 ¶ 42.

¶8            All parties filed petitions for review in this Court. We granted review because whether ADWR is required to consider unquantified federal reserved water rights when determining the adequacy of developers' water supplies presents an issue of statewide importance.  We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

4

## II.  STANDARD OF REVIEW

**¶9**        We review issues of statutory interpretation de novo, *Ariz. Water Co. v. Ariz. Dep't of Water Res.*, 208 Ariz. 147, 151 ¶ 16 (2004), but will defer to an agency's factual findings unless they are "arbitrary, capricious, or . . . an abuse of discretion," *J. W. Hancock Enters., Inc. v. Registrar of Contractors*, 126 Ariz. 511, 513 (1980).

## III.  ARIZONA WATER LAW AND THE FEDERAL RESERVED WATER RIGHTS DOCTRINE

**¶10**        "Arizona law distinguishes groundwater from surface water, even though such waters may be hydrologically connected." *Davis v. Agua Sierra Res., L.L.C.*, 220 Ariz. 108, 110 ¶ 10 (2009).  The doctrine of prior appropriation governs surface water, including its subflow.  *Id.* at 110 ¶ 10, 112 ¶ 19.  Prior appropriation is "a seniority system determined by the date on which the user initially puts water to a beneficial use."  *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source* (*Gila V*), 201 Ariz. 307, 310 ¶ 4 (2001).  Senior rights-holders are entitled to use their entire water allotments before junior rights-holders receive any water.  *Id.*

**¶11**        Groundwater, by contrast, is not subject to prior appropriation, but is instead "governed by the traditional common law notion that water percolating generally through the soil belongs to the overlying landowner, as limited by the doctrine of reasonable use." *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source* (*Gila II*), 175 Ariz. 382, 386 (1993).  "The doctrine of reasonable use permits an overlying landowner to capture as much groundwater as can reasonably be used upon the overlying land and relieves the landowner from liability for a resulting diminution of another landowner's water supply." *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source* (*Gila III*), 195 Ariz. 411, 415 ¶ 7 n.3 (1999) (citing *Bristor v. Cheatham*, 75 Ariz. 227, 237–38 (1953)).  Our legislature has codified the right of overlying landowners to "[w]ithdraw and use groundwater for reasonable and beneficial use" in areas outside AMAs.  A.R.S. § 45-453(1).  AMAs are subject to the more stringent "assured water supply" regulations, *see* A.R.S. § 45-576, whereas non-AMA areas are subject to "adequate water supply" requirements, *see* § 45-108(A), (I).

¶12　　　　Although surface water and groundwater are governed by different legal regimes in Arizona, both are subject to the federal reserved water rights doctrine. *See Gila III*, 195 Ariz. at 420 ¶ 31 (holding that the federal reserved water rights doctrine applies to groundwater in addition to surface water). Under that doctrine, when the federal government creates a federal reservation of public land, it also reserves "only that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert v. United States*, 426 U.S. 128, 141 (1976). Determining the purpose of a reservation and "the waters necessary to accomplish that purpose are inevitably fact-intensive inquiries that must be made on a reservation-by-reservation basis," *Gila III*, 195 Ariz. at 420 ¶ 31 (citing *United States v. New Mexico*, 438 U.S. 696, 700 (1978)), and we construe federal reserved water rights narrowly due to their "disruptive effect in prior appropriation jurisdictions," *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 231 Ariz. 8, 13 ¶ 16 (2012).

¶13　　　　The federal reserved water rights doctrine applies to groundwater, but only "where other waters are inadequate to accomplish the purpose of a reservation." *Gila III*, 195 Ariz. at 420 ¶ 31; *see also Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1271 (9th Cir. 2017). If a federal reserved water right is infringed by groundwater pumping, the federal government may obtain an injunction. *See Gila III*, 195 Ariz. at 422 ¶ 38 (citing *Cappaert*, 426 U.S. at 141). But any injunction that issues must "be appropriately tailored to [the reservation's] minimal need," and we do not apply "a zero-impact standard of protection for federal reserved rights." *Id.* Thus, the federal reserved water rights doctrine effectively modifies the doctrine of reasonable use, as codified in § 45-453, because it restricts an overlying landowner's right to pump groundwater to the extent required "to preserve the waters necessary to accomplish the purpose of [a federal] reservation." *See Gila III*, 195 Ariz. at 421–22 ¶¶ 34–38.

¶14　　　　Another regulation on the use of water in Arizona is the adequate water supply designation process. Under A.R.S. § 11-823(A), a county, at its option, may require a developer to obtain an adequate water supply designation from ADWR before approving a new subdivision.[1] The

--------

[1] Cochise County, acting pursuant to this statutory authority, requires developers to obtain an adequate water supply designation before it will

director of ADWR ("Director") is charged with determining "whether there is an adequate water supply for the subdivision." § 45-108(B). Section 45-108(I) provides a two-part definition of "adequate water supply." First, it means that "[s]ufficient groundwater, surface water or effluent of adequate quality will be continuously, legally and physically available to satisfy the water needs of the proposed use for at least one hundred years." § 45-108(I)(1). Second, it requires a developer to demonstrate that it has "[t]he financial capability . . . to construct the water facilities necessary to make the supply of water available for the proposed use." § 45-108(I)(2).

¶15    We consider in this case ADWR's regulations defining physical and legal availability. With the background of Arizona water law in mind, we turn first to the physical availability regulation.

## IV. PHYSICAL AVAILABILITY

¶16    We agree with all parties that the court of appeals erred in directing ADWR to consider BLM's unquantified federal reserved water right under ADWR's physical availability regulation. We interpret agency regulations according to principles of statutory construction. *Home Depot USA, Inc. v. Ariz. Dep't of Revenue*, 230 Ariz. 498, 501 ¶ 10 (App. 2012). Accordingly, if a statutorily authorized regulation is unambiguous, "we apply it without further analysis." *Glazer v. State*, 237 Ariz. 160, 163 ¶ 12 (2015).

¶17    ADWR's physical availability regulation, A.A.C. R12-15-716, requires an applicant for an adequate water supply designation to submit a hydrologic study to the Director that "accurately describes the hydrology of the affected area." *Id.* R12-15-716(B). The Director, in turn, "shall determine" that groundwater is physically available if two requirements are met. *Id.* First, the groundwater must be withdrawn "from wells owned by the applicant or the proposed municipal provider that are located within the service area of the applicant or the proposed municipal provider." *Id.* R12-15-716(B)(1)(a). Second, the groundwater must be "withdrawn from depths that do not exceed the applicable maximum 100-year depth-to-static water level." *Id.* R12-15-716(B)(2). Here, the applicable 100-year depth-to-static water level is "1200 feet below land surface" because the Tribute

---

approve a final plat for a subdivision. *See* Cochise County Subdivision Reg. 408.03.

development site is not located in an AMA and Tribute will not be a dry lot development. *See id.*; *see also id.* R12-15-701(36) (defining "[d]ry lot development" as "a development or subdivision without a central water distribution system"). Most relevant to the court of appeals' holding is the regulation's requirement that the Director consider, in calculating the projected 100-year depth-to-static water level, "[t]he projected declines [in the water level] caused by existing uses." *Id.* R12-15-716(B)(3)(b); *see also Silver*, 241 Ariz. at 142 ¶ 39.

¶18 As Plaintiffs concede, Pueblo satisfies both prongs of the physical availability regulation. Pueblo's wells are located within its service area, which satisfies the first prong. The uncontested evidence from Pueblo's hydrologic model satisfies the second prong. The model shows that the development's groundwater will be withdrawn from a depth-to-static level of no greater than 650 feet after 100 years of pumping—well within the 1200-foot limit of A.A.C. R12-15-716(B)(2).

¶19 Although BLM did not challenge ADWR's physical availability finding in the superior court, the court of appeals relied on the "existing uses" language in A.A.C. R12-15-716(B)(3)(b) to require ADWR to consider BLM's unquantified federal reserved water right. *Silver*, 241 Ariz. at 142 ¶ 39. It reasoned that "[t]he water supporting [SPRNCA] is . . . an 'existing use'" that ADWR must consider in making its physical availability determination. *Id.* But by ordering ADWR to assess the impact of "projected declines" in groundwater supply caused by Pueblo's pumping on BLM's "existing use," the court of appeals misconstrued the physical availability regulation.

¶20 On its face, the regulation requires ADWR to do the converse. Namely, it requires the agency to measure the impact of "existing uses" on groundwater supply available for an applicant, not the impact of the applicant's proposed groundwater use on "existing uses." *See* A.A.C. R12-15-716(B)(3)(b). The regulation operates to ensure that enough groundwater is physically available in the aquifer to meet the needs of the applicant, after accounting for declines in supply "caused by existing uses." *See id.* The regulation is not a mechanism for considering potential legal disputes between groundwater users. Because Pueblo indisputably satisfies both prongs of the physical availability regulation, the court of appeals erred in requiring ADWR to consider BLM's unquantified federal reserved water right as part of the physical availability analysis.

## V. LEGAL AVAILABILITY

**¶21**　　　　Plaintiffs and our dissenting colleagues contend that ADWR's legal availability regulation, A.A.C. R12-15-718, is unenforceable because it is inconsistent with § 45-108(I).  We disagree.  Section 45-108(I) requires, in part, that a proposed development's water supply be legally available "to satisfy the water needs of the proposed use for at least one hundred years," which Plaintiffs and the dissents view as meaning the agency must consider unquantified federal reserved water rights.  A.A.C. R12-15-718 provides that a private water company (such as Pueblo) has a "legally available" supply of groundwater when it possesses a CC&N.  *See id.* R12-15-718(B)(3)(a), (C).

**¶22**　　　　"Our primary goal in interpreting statutes is to effectuate the legislature's intent" as expressed in the statute's text.  *Rasor v. Nw. Hosp., LLC,* 243 Ariz. 160, 164 ¶ 20 (2017).  If a statute is unambiguous, "we apply it without further analysis."  *Glazer*, 237 Ariz. at 163 ¶ 12.  If a statute is ambiguous, we may consider secondary tools of statutory construction, including the prior-construction canon of statutory interpretation.  *Cf. Moore v. Chilson*, 26 Ariz. 244, 254 (1924) (recognizing the prior-construction canon); *see also In re Marriage of Friedman & Roels*, 244 Ariz. 111, 115 ¶ 14, 116 ¶ 20 (2018) (applying the prior-construction canon).  According to that canon, "[i]f a statute uses words or phrases that have already received . . . uniform construction by . . . a responsible administrative agency, they are to be understood according to that construction."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012).  The canon applies whenever the "administrative interpretation antedates the [legislative] enactment" because in such cases, "[t]he term has acquired . . . a technical legal sense," apart from its ordinary meaning, "that should be given effect."  *Id.* at 324; *see also Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 437 (1986) ("When the statute giving rise to the longstanding [agency] interpretation has been reenacted without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" (quoting *NLRB v. Bell Aerospace*, 416 U.S. 267, 275 (1974))); *Bell Aerospace*, 416 U.S. at 274–75 ("[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration.").

¶23 Here, the term "legally available" is ambiguous concerning consideration of unquantified federal reserved water rights. In fact, the statutory scheme is silent on the issue. It does not mention federal reserved water rights at all, nor does it define "legally available." It is also not apparent from the term's plain language that it encompasses unquantified water rights that cannot be enforced now (or possibly ever) to enjoin a developer's groundwater pumping. "Legally available" could be interpreted as requiring ADWR to consider every conceivable water right that might someday affect a prospective developer's right to pump groundwater. Alternatively, it could mean that ADWR is only required to consider conflicting rights that are presently enforceable, or that a developer has a right to pump groundwater pursuant to the reasonable use doctrine. In other words, "legally available" is a broad phrase that could be interpreted in myriad ways. Indeed, it is a textbook example of a term that is "[c]apable of being understood in either of two or more possible senses" or "[u]ncertain as regards course or outcome"—the dictionary definitions of "ambiguous." *Ambiguous*, Webster's Second New International Dictionary 81 (1949).

¶24 Chief Justice Bales' dissent hinges on the premise that "legally available" is unambiguous and requires ADWR to consider unquantified federal reserved water rights. He reasons that "[i]f the legislature had meant that a CC&N alone could establish 'legal availability,' it could have easily said so." *Infra* ¶ 54. However, the legislature could have also said that "ADWR shall consider unquantified federal reserved water rights in making its legal availability determination." As previously noted, the legislature's silence on the issue evidences the statute's ambiguity.

¶25 But we are not left to guess the meaning of "legally available." The history of § 45-108 and ADWR's regulations interpreting it shows that the legislature intended to adopt ADWR's definition of "legal availability." Before 2007, § 45-108 gave the Director discretion to "designate cities, towns and private water companies as having an adequate water supply," but did not define "adequate water supply." *See* 1994 Ariz. Sess. Laws, ch. 203, § 1 (2d Reg. Sess.). The legislature apparently left that task to ADWR, which in 1995 construed "adequate water supply" as having three defined elements: physical availability, continuous availability, and legal availability. *See* A.A.C. R12-15-717(A)–(D) (Feb. 7, 1995). ADWR last amended the legal availability regulation in September 2006. *See* 12 Ariz. Admin. Reg. 3549– 52 (Sept. 29, 2006); *see also* A.A.C. R12-15-718 (Historical Note).

Importantly, when the legislature amended § 45-108 in 2007 to define adequate water supply, it adopted the same three elements—physical, continuous, and legal availability—without defining them. *See* § 45-108(I); 2007 Ariz. Sess. Laws, ch. 240, § 8 (1st Reg. Sess.). These concepts are unique to ADWR's adequate water supply regulations. And any contention that the legislature was unaware of ADWR's definitions of physical, continuous, and legal availability falls flat. Notably, the legislature ordered ADWR to make specific amendments to its physical availability regulation. *See* 2007 Ariz. Sess. Laws, ch. 240, § 10 (1st Reg. Sess.).

**¶26**　　　　Given that ADWR's definition of adequate water supply predates the legislative enactment by twelve years and was adopted by the legislature without change in 2007, we interpret the term "legal availability" according to ADWR's construction as of 2007. *See* Scalia & Garner, *supra*, at 322. The prior-construction canon applies with even greater force here because the legislature did not merely reaffirm an existing statutory definition in light of a new agency interpretation; it amended § 45-108 to add the precise language that originated in ADWR's regulations and that operationalized its adequate water supply regulatory scheme twelve years earlier. The fact that the legislature ordered ADWR to amend its physical availability regulation but not its legal availability regulation demonstrates that the legislature was aware of ADWR's regulations and capable of ordering amendments to the ones it found objectionable. *See* 2007 Ariz. Sess. Laws, ch. 240, § 10 (1st Reg. Sess.). Consequently, we hold that ADWR's "legal availability" regulation is consistent with § 45-108 because the legislature amended the statute to adopt ADWR's definition of that term.

**¶27**　　　　The dissents take issue with our application of the prior-construction canon to ADWR's definition of legal availability but express no similar qualms about the legislature's implicit adoption of the agency's definition of physical availability. In fact, they agree with the analysis above applying ADWR's physical availability regulation as written. Yet the dissents provide no principled reason, other than policy concerns, for accepting ADWR's definition of physical availability at face value while rejecting its definition of legal availability.

**¶28**　　　　The dissents also contend that the prior-construction canon should not apply in light of the legislature's recent amendment of A.R.S. § 12-910. *See infra* ¶¶ 56–57, 82–83. That amendment requires Arizona

courts to "decide all questions of law, including the interpretation of a constitutional or statutory provision or a rule adopted by an agency, without deference to any previous determination that may have been made on the question by the agency." *See* 2018 Ariz. Sess. Laws, ch. 180, § 1 (2d Reg. Sess.) (effective Aug. 3, 2018). But the dissents' argument conflates judicial deference (also known as "*Chevron* deference") with legislative adoption. The amendment prohibits courts from deferring to agencies' interpretations of law. *See id.* ("[T]he *court* shall decide all questions of law . . . ." (emphasis added)). The amendment does not, however, prohibit the *legislature* from adopting an agency's interpretation of a term of art. The latter is what we have here, where the legislature amended § 45-108 to incorporate the term "legally available" from ADWR's regulation into the statute.

¶29        Moreover, in arguing that our interpretation of § 45-108 "renders 'legally available' meaningless," *infra* ¶ 53, or "surplusage," *infra* ¶ 76, the dissents seem to overlook the bifurcated nature of Arizona's water management regime. Surface water rights are often subject to myriad competing legal claims because they are governed by the doctrine of prior appropriation. *Supra* ¶ 10. This explains ADWR's robust regulation addressing the legal availability of surface water. *See* A.A.C. R12-15-718(E). But groundwater is subject to a very different legal doctrine—the doctrine of reasonable use—which provides that an overlying landowner has the *legal right* to "capture as much groundwater as can reasonably be used upon the overlying land." *Gila III*, 195 Ariz. at 415 ¶ 7 n.3; *see also* § 45-453. Far from "vitiating the statute's language," *infra* ¶ 53, ADWR's legal availability regulation reflects the operation of the reasonable use doctrine.

¶30        The dissents conclude that obtaining a CC&N is essentially a pro forma process that "tells us absolutely nothing about the legal availability of water." *Infra* ¶ 80. They are wrong to discount the CC&N's procedural and substantive rigors. The Commission is required "to investigate all applicants for" a CC&N and can issue a CC&N "[o]nly upon a showing that the issuance to a particular applicant would serve the public interest." *James P. Paul Water Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 426, 429 (1983). Even after the Commission has issued a CC&N, "a water company must comply with orders and regulations promulgated by the Commission in the public interest," including orders and regulations that "may mandate

installation of additional facilities."[2] *Id.* at 429–30 (citing A.R.S. § 40-331). Pursuant to its statutory authority, the Commission can order "additions or improvements" to a CC&N-holder's facilities when the Commission finds that such additions or improvements "promote the security or convenience of . . . the public." § 40-331(A). The Commission has used this authority to order a CC&N-holder to extend its water distribution main "for the benefit of its existing customers," *see Ariz. Water Co. v. Ariz. Corp. Comm'n*, 161 Ariz. 389, 392 (App. 1989), and the burden of proof in a proceeding to challenge an order of the Commission is on "the party adverse to the commission . . . to show by clear and satisfactory evidence that [the order] is unreasonable or unlawful," A.R.S. § 40-254(E). Although we do not decide the issue here, the Commission could presumably use this authority to order construction of a groundwater recharge facility if a CC&N-holder's water supply were limited by an injunction, as such a limitation may threaten "the security or convenience of . . . the public." *See* § 40-331(A).

¶31        At bottom, the dissents would prioritize the consumer protection "purpose" of § 45-108 as expressed in the selective senate testimony of a former ADWR director, *infra* ¶ 49, over the legislature's intent as expressed in its adoption of terms of art from ADWR's regulations. But at multiple points in the senate hearing Chief Justice Bales relies on, two senators emphasized the importance of balancing water supply management and private property rights. *See, e.g.*, *Hearing on S.B. 1575 before the S. Nat. Res. & Rural Affairs Comm.*, 48th Leg., First Reg. Sess. 2007 (Feb. 14, 2007) (statement of Senator Jake Flake, Chairman of the Senate Committee on Natural Resources and Rural Affairs) ("But even as important as" managing growth and protecting water supply "is protecting . . . private property rights."). The dissents ignore the balance the legislature struck between water resource management and landowners' property rights, and their position would add an impediment to the already comprehensive adequate water supply designation scheme, thereby hindering the ability of property owners to develop land. It is for the legislature, not this Court, to add this impediment. We decline to follow the dissents' method of statutory interpretation. *See Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) ("The question . . . is not what [the legislature] 'would have wanted' but what [the legislature] enacted . . . .").

---

[2] Therefore, it is simply incorrect to claim, as Justice Bolick does, that the CC&N requirement has no effect after a CC&N issues. *See infra* ¶ 80.

¶**32**        Even if we were interpreting the term "legal availability" without the aid of the prior-construction canon, the wisdom of interpreting that term to require consideration of unquantified federal reserved rights is questionable.  ADWR does not have the authority to quantify BLM's rights; that is the exclusive domain of the Gila Adjudication.  *See Gila III*, 195 Ariz. at 414 ¶ 2 (citing A.R.S. §§ 45-251(2), 252(A)).  Instead, ADWR could only speculate about the extent of federal reserved water rights and the impact of prospective pumping on those rights.  The stakes of this speculative process would be exceedingly high, given that a finding of inadequate water supply precludes development in counties that require an adequate water supply designation pursuant to § 11-823(A).

¶**33**        Our caselaw also disfavors consideration of unquantified federal reserved water rights.  In *Gila III*, we rejected as "premature" the plaintiffs' request to immediately enjoin groundwater pumping that was depleting the groundwater supply beneath Indian reservations.  195 Ariz. at 421 ¶ 35 n.12.  We reasoned that "[u]ntil federal rights are quantified, it cannot be determined which if any of the tribes are entitled to [injunctive] relief." *Id.*

¶**34**        Our reticence in *Gila III* to provide injunctive relief based upon unquantified federal reserved water rights applies with equal force in the regulatory context.  Here, the legal hurdles for obtaining an injunction to protect federal reserved water rights illustrate the inherently speculative nature of the inquiry ADWR would be required to undertake.  *See supra* ¶¶ 11–13.  First, ADWR would have to make an educated guess about the amount of water a judge in the Gila Adjudication will deem necessary to accomplish SPRNCA's purpose, including whether surface water alone is sufficient to satisfy the reservation's needs.  *See Gila III*, 195 Ariz. at 420 ¶ 31.  Determining the minimum amount of water necessary to accomplish a reservation's purpose is inevitably a "fact-intensive inquir[y]," *id.*, and it is far from certain that ADWR would reach the same conclusion as the trial judge in the Gila Adjudication.   Any difference between ADWR's quantification guesswork and the Gila Adjudication's actual outcome would widen the margin of error in subsequent stages of ADWR's analysis.[3]   The established facts Chief Justice Bales' dissent discusses—

---

[3] To circumvent this speculative process, BLM contends that ADWR should consider its right at face value, as ADWR considers certain surface water

SPRNCA's conservation purpose and priority date—would hardly narrow that margin. *See infra* ¶ 66.

**¶35** After making a tentative prediction about the outcome of the Gila Adjudication, ADWR would then have to determine whether Pueblo's pumping would impact BLM's right. At a minimum, this would likely require a study to determine whether there is a hydrologic connection between the proposed wells and SPRNCA's water sources. Other relevant considerations may include the distance between the wells and the reservation, pumping from other wells in the area, and the amount of groundwater recharge from wastewater treatment facilities.

**¶36** Ultimately, ADWR would have to analyze the likelihood that Plaintiffs would succeed in obtaining an injunction and make an educated guess about how a court would "appropriately tailor[]" an injunction to satisfy SPRNCA's "minimal need." *See Gila III*, 195 Ariz. at 422 ¶ 38. Without conducting such an analysis, the entire exercise of considering an unquantified federal reserved water right would be futile; the point is to determine whether the federal government's unquantified right could be enforced against Pueblo to prevent it from obtaining an adequate water supply. Because groundwater is subject to the reasonable use and the federal reserved water rights doctrines, not prior appropriation, *supra* ¶¶ 11–13, only an injunction based on a federal reserved water right could legally inhibit Pueblo's right to pump. This is the elephant in the room that the dissents ignore when they attempt to downplay the extent of the speculation they would require ADWR to undertake. *See infra* ¶¶ 66–67, 84, 87. Indeed, the dissents conflate the nature of ADWR's speculation concerning physical and legal availability (i.e. hydrology models versus court proceedings) and thus fail to appreciate the novelty of turning a state agency that specializes in water management into a fortune-teller that must predict the outcome of two separate court proceedings—one that has been pending for nearly forty years with no end in sight (the Gila Adjudication), and one that is purely hypothetical (the injunction proceeding). Worse still,

---

claims elsewhere in the legal availability regulation. *See* A.A.C. R12-15-718(E)(3). Face value consideration is not warranted here because the regulations do not contemplate its application to groundwater and no one can predict with any degree of certainty what quantified rights the Gila Adjudication, which is hotly contested, will assign to BLM.

ADWR's speculation regarding the injunction proceeding would be based on its earlier speculation regarding the outcome of the Gila Adjudication.

¶37 Requiring ADWR to conduct an injunction analysis would also break with *Gila III*'s instruction that an injunction is a "premature" remedy to enforce an unquantified federal reserved water right. *See Gila III*, 195 Ariz. at 421 ¶ 35 n.12. We decline Plaintiffs' implicit invitation to transform ADWR, by judicial fiat, into a forum for anticipatory injunctive relief through regulation based upon unquantified federal reserved water rights.

¶38 Finally, Plaintiffs and the dissents contend that failing to consider unquantified federal reserved water rights undermines the consumer protection purpose of § 45-108. It does not. The adequate water supply designation process originated in the 1970s as a mechanism for protecting consumers against unscrupulous developers who sold subdivided property that lacked a water source. *See* L. William Staudenmaier, *Between a Rock and a Dry Place: The Rural Water Supply Challenge for Arizona*, 49 Ariz. L. Rev. 321, 329 (2007) ("In 1973, the Arizona Legislature enacted a statewide water adequacy statute as a consumer protection measure in response to marketing of residential lots without available water supplies."); *see also* Thomas E. Sheridan, *Arizona: A History* 336 (1995) (discussing Ned Warren, a developer who sold lots to consumers that had "no roads, no water, and no electricity"). The legislature has added consumer safeguards to the process over the years, making its last substantive change to § 45-108 in 2007. *See* 2007 Ariz. Sess. Laws, ch. 240, § 8 (1st Reg. Sess.).

¶39 The dissents' position seems to ignore the fact that legal availability, like continuous or physical availability, is but one component of an integrated scheme defining "adequate water supply." In its current form, § 45-108 provides consumers with vigorous protections against unscrupulous developers. As discussed above, *supra* ¶ 14, a developer must demonstrate that it has a 100-year supply of water to obtain an adequate water supply designation. § 45-108(I)(1). The developer must also show that it has the financial capability to construct the necessary water supply facilities. § 45-108(I)(2). Counties, in turn, may automatically deny final plat approval to any developer who fails to satisfy any of § 45-108(I)'s requirements. *See* § 11-823(A). Far from leaving consumers at the mercy of "shifty" developers, this scheme, even without considering unquantified

16

federal reserved water rights, provides consumers with considerable protection.

**¶40** Yet § 45-108 does not eliminate all water supply risk for consumers, nor was it designed to do so. The statute balances the reward of economic development with the mitigated risk that ADWR's water supply estimates will prove inaccurate or be subjected to revisions. The statutory scheme explicitly contemplates that a change in circumstances may result in the revocation of an adequate water supply designation. *See* § 45-108(F) ("The director may revoke a designation made pursuant to this section when the director finds that the water supply may become inadequate."). It follows that the statute does not require developers to demonstrate absolute certainty of supply and that consumers who purchase land in reliance on an adequate water supply designation may have their expectations upended. Moreover, if the Director revokes an adequate water supply designation, consumers have no recourse against the state, the Director, or ADWR. *See* § 45-108(G) (providing that "[t]he state of Arizona and the director or department shall not be liable" for issuing a designation, so long as it was "prepared in good faith pursuant to this section"). Any suggestion that the statute, as written, mandates a moratorium on development in the absence of an absolute certainty of a future water supply misconstrues its meaning and purpose. *Cf.* A.R.S. § 45-401(B) (stating that groundwater management is necessary to "protect[] and stabiliz[e] the general economy and welfare of this state and its citizens").

**¶41** More fundamentally, neither § 45-108 nor A.A.C. R12-15-718 contemplates the issue of federal reserved water rights. Although *Cappaert*, which the United States Supreme Court decided in 1976, put the legislature and ADWR on notice that the federal government "can protect its water from subsequent diversion[s]" of groundwater, 426 U.S. at 143, neither the statute nor the regulation requires ADWR to consider unquantified federal reserved water rights as part of its legal availability analysis. This Court does not have the constitutional authority to construe a statute so that it encompasses matters that were not covered or addressed by the legislature. *See, e.g.*, *Iselin v. United States*, 270 U.S. 245, 251 (1926) (Brandeis, J.) ("To supply omissions transcends the judicial function."); Scalia & Garner, *supra*, at 93 (discussing the omitted-case canon, which provides that "[n]othing is

to be added to what the text states or reasonably implies . . . That is, a matter not covered is to be treated as not covered").[4]

**¶42** Chief Justice Bales asserts that the majority "prioritizes the interests of subdivision developers over those of homeowners." *Infra* ¶ 69. We do not, nor is it this Court's prerogative to make this choice. Instead, we acknowledge and defer to the legislature's judgment. Whether the adequate water supply designation process should go further in protecting consumers is a matter for the legislature. As a threshold matter, the legislature could jettison the opt-in scheme and mandate counties' participation in the adequate water supply designation process. That the legislature did not make the process mandatory statewide further demonstrates the legislature's intent to provide only limited protection to consumers and simultaneously encourage development. If the scheme rigorously focused solely on consumer protection, as the dissents contend, we would expect it to be mandatory. Alternatively, the legislature could require ADWR, as Plaintiffs and the dissents urge, to engage in a comprehensive assessment of the potential impact of unquantified federal reserved water rights based upon speculative projections about litigation outcomes years or decades in the future. The legislature could in turn require ADWR to halt economic development by denying adequate water supply designations where unquantified federal reserved water rights cast any doubt on developments' 100-year water supplies. The legislature could also mandate developers to warn consumers that unquantified federal reserved water rights may impact the water supply of developments in

---

[4] Justice Bolick claims that we mainly rely on only one canon of statutory interpretation—the prior-construction canon—and suggests that his interpretation is superior because he relies on two. *Infra* ¶¶ 75–76. In fact, we also rely on the omitted-case canon and the ordinary meaning canon. For the reasons discussed above, *supra* ¶¶ 29, 38–39, his application of the presumption against ineffectiveness and the surplusage canon is misguided because it arises from the erroneous premise that an interpretation of a statute that fails to give its purpose the most fulsome effect, rather than defeats or obstructs its purpose, necessarily renders the statute ineffective or surplusage.

Tribute's position.[5] But the legislature has not done any of these things. In its current form, and in context, § 45-108 reflects the legislature's decision to adopt ADWR's definition of legal availability.

¶43 For all these reasons, we conclude that A.A.C. R12-15-718 is consistent with § 45-108 and that neither requires ADWR to consider unquantified federal reserved water rights as part of its legal availability analysis. In so holding, we need not decide whether ADWR must consider *quantified* federal reserved water rights. ADWR conceded at oral argument that it would have to acknowledge a quantified federal reserved water right if the federal government could prove, likely through an injunction proceeding, that an applicant's prospective groundwater pumping would infringe upon that right. ADWR's concession arises from the fact that the federal reserved water rights doctrine restricts the otherwise permissible reasonable and beneficial use of groundwater, codified in § 45-453, to the extent required to preserve the waters necessary to accomplish the purpose of a federal reservation. *Supra* ¶ 13. As such, ADWR acknowledges that an applicant for an adequate water supply designation, like any groundwater user outside an AMA, is subject to the reasonable use doctrine, as modified by the federal reserved water rights doctrine, and an injunction may, of its own force, prohibit or require action by ADWR independent of the legal availability process.

¶44 We readily acknowledge the consumer protection policy that animates the dissents. But this case is not about the wisdom of the policy underlying the adequate water supply statute. Our task is to discern the statute's meaning. The term "legally available" did not arise in a vacuum. The dissents ignore the determinative significance of the genesis of the "adequate water supply" regulation and the context in which the legislature adopted it. For the reasons discussed, when the legislature adopted ADWR's regulation, it also imported ADWR's definitions operationalizing the scheme. We decline to recast the statute's meaning under the guise of interpreting it. Ultimately, the degree of acceptable risk

---

[5] At oral argument, Pueblo conceded that regardless of what the law requires, it would "have no problem" giving notice to prospective homebuyers that the development's water rights may be adversely affected by the outcome of the Gila Adjudication. We admonish Pueblo to perform on its promise to be forthright with consumers about the potential impact of BLM's federal reserved water right on the development's water supply.

to consumers' water supplies is a policy judgment best suited for the legislature. *Cf. City of Phoenix v. Butler*, 110 Ariz. 160, 162 (1973) ("[I]t is not the function of the courts to rewrite statutes."). If the legislature intended to require ADWR to consider unquantified federal reserved water rights under its legal availability analysis, it failed to do so in § 45-108. The legislature, not this Court, may impose such a requirement.

## VI. ATTORNEY FEES

**¶45**      Silver and Gerrodette request attorney fees under the private attorney general doctrine and A.R.S. § 12-348. We deny their request under § 12-348 because they did not prevail in this action. *See* § 12-348(A) (requiring a party to prevail on the merits in order to receive an award of fees). To receive an award of attorney fees under the private attorney general doctrine, a party must "vindicate[] a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Arnold v. Ariz. Dep't of Health Servs.*, 160 Ariz. 593, 609 (1989). Because we hold in favor of Pueblo, Plaintiffs have not vindicated any right. Additionally, the right Plaintiffs seek to vindicate does not require private enforcement; BLM has been a party to this litigation throughout.

## VII. CONCLUSION

**¶46**      We hold that ADWR is not required to consider unquantified federal reserved water rights under its physical availability or legal availability analysis. We vacate the decisions of the superior court and the court of appeals and affirm ADWR and the ALJ's approval of Pueblo's application.

BALES, C.J., joined by PELANDER, J., concurring in part and dissenting in part.

¶47 Arizona's legislature amended A.R.S. § 45-108 to ensure purchasers do not unknowingly buy land without access to adequate water. Although the statute requires the Arizona Department of Water Resources ("ADWR") to determine if water will be "legally available" for a proposed subdivision for the next 100 years, *see* § 45-108(I)(1), ADWR contends it can ignore whether the subdivision's access to water may be limited by congressionally recognized water rights for the San Pedro Riparian National Conservation Area ("SPRNCA"). Because ADWR's position is contrary to the statute's language and purpose, I respectfully dissent from Part V of the majority opinion and the conclusion that the legal availability requirement was met here.

## I.

¶48 Our primary "task in interpreting the meaning of a statute is to fulfill the intent of the legislature that wrote it." *State v. Williams*, 175 Ariz. 98, 100 (1993). "To determine a statute's meaning, we look first to its text." *State v. Burbey*, 243 Ariz. 145, 147 ¶ 7 (2017). By its terms, "legally available" refers to water that can be appropriated or used without violating the law, i.e., without conflicting with senior water rights. Water will not be available for the proposed subdivision's groundwater pumping if that use will withdraw water necessary to fulfill the purpose of the SPRNCA. *See Cappaert v. United States*, 426 U.S. 128, 141-45 (1976). By ignoring this fact, while purporting to make a 100-year availability determination, ADWR undermines § 45-108's core purpose.

¶49 ADWR Director Herb Guenther testified before the Senate Natural Resources and Rural Affairs Committee in 2007 to explain the background and purpose of the adequate water supply program. *See generally Hearing on S.B. 1575 Before the S. Nat. Res. and Rural Affairs Comm.*, 48th Leg., 1st Reg. Sess. 2007 (Feb. 14, 2007) (statement of Herb Guenther, Director, ADWR). The legislature enacted the program in 1973 as a consumer protection program in the wake of predatory sales of land without adequate water. *Id.* Although well-intentioned, the initial scheme was fraught with loopholes. *Id.* In 2007, the legislature sought to fortify the adequate water supply program by giving municipalities the authority necessary to properly plan for development. *Id.* As Director Guenther

testified, "if you don't have an adequate supply, you are just going to postpone it until someone else has to deal with the crisis when [the water] supply comes up short." *Id.*

¶50      Rather than consider whether the water supply will "come up short" considering all the projected uses – and thus whether water will be "legally available" for the proposed subdivision – ADWR contends that it need only consider whether Pueblo del Sol ("Pueblo") seeks to withdraw groundwater for a beneficial use under A.R.S. § 45-453 and has a certificate of convenience and necessity ("CC&N") allowing it to deliver water to customers as required by ADWR's rule, Arizona Administrative Code R12-15-718(C). In affirming ADWR's position, the majority relies on the canon of prior construction to conclude the legislature has endorsed ADWR's rule. *Supra* ¶¶ 25-26.

¶51      The majority argues the statutory phrase "legally available" is ambiguous as to federal reserved water rights because it does not specifically mention them. *Supra* ¶ 23. This approach stands the normal understanding of language on its head: instead of assuming the general term includes the more specific (i.e., whether water is "legally available" embraces whether usage will be limited by prior and superior federal rights), the majority incorrectly posits that the general term is ambiguous because it does not expressly include the more specific. Because § 45-108 directs ADWR to "evaluate" if water will be "legally available" for Pueblo's proposed pumping, requiring ADWR to consider the SPRNCA's reserved rights reflects applying the statute by its terms.

¶52      Having concluded that "legally available" does not mean what it says, the majority proceeds to conclude that the legislature implicitly intended to adopt ADWR's interpretation, even though, according to the majority, *supra* ¶ 41, that interpretation does not even contemplate the impact of federal reserved water rights. But the congressionally reserved rights for the SPRNCA indisputably could, as a matter of federal and state law, limit prospective groundwater withdrawals for the subdivision. To allow ADWR to close its eyes to this fact in assessing if water will be legally available, the majority squints to find statutory ambiguity. Such interpretative myopia is not compelled by any canon of construction.

**¶53**		Given the plain language and manifest consumer protection purposes of § 45-108, the majority's adherence to the canon of prior construction is perplexing.  In the context of this case, ADWR's position impermissibly renders "legally available" meaningless.  Counties outside active management areas, like Cochise, must opt in before developers are required to obtain an adequate water supply designation, *see* A.R.S. § 11-823(A), which includes the statutory requirement of legal availability.  But this phrase has no force with respect to private water companies if it refers only to a CC&N and beneficial use under A.R.S. § 45-453, as those requirements apply whether or not a county chooses to be in the adequate water supply program.  *See* A.R.S. § 40-281; *Ariz. Water Co. v. Ariz. Corp. Comm'n*, 217 Ariz. 652, 656 ¶ 11 (App. 2008) (discussing CC&N requirement).  Instead of vitiating the statute's language, we should interpret "legally available" as having independent meaning consistent with § 45-108's purpose.  *See Hohokam Irrigation and Drainage Dist. v. Ariz. Pub. Serv. Co.*, 204 Ariz. 394, 398 ¶ 15 (2003) (noting that we seek to "give meaning to each word, clause or sentence, considered in light of the entire act and the purpose for which it was enacted into law"); *State v. Pitts*, 178 Ariz. 405, 407 (1994) (presuming that "the legislature did not intend to write a statute that contains a void, meaningless, or futile provision").

**¶54**		At bottom, ADWR's rule cannot overcome the language of § 45-108.  If the legislature had meant that a CC&N alone could establish "legal availability," it could have easily said so.  This point is not answered by the majority's effort to characterize ADWR's rule as a "longstanding interpretation" that predated the 2007 amendments.  *Supra* ¶¶ 25-26.  Even ADWR does not think its rule fully defines "legal availability," as it acknowledged in this Court that the phrase also requires compliance with § 45-453 (which is not specified in the rule).  Thus, ADWR itself recognizes that a controlling background legal principle, such as the "reasonable use" requirement of § 45-453, can affect whether water will be "legally available," and the same should be true for federal reserved water rights.  If ADWR itself has not interpreted its rules as fully defining the term "legal availability," then how can one impute to the legislature any intent to endorse such an interpretation as a matter of prior construction?

**¶55**		The majority accuses the dissents of seeking to "add" to or "recast" § 45-108 to cover matters it does not address.  *Supra* ¶¶ 31, 41, 44.  This assertion falls flat: the majority inconsistently argues both that the

statute does not apply as written and that the dissents' interpretation improperly seeks to rewrite it; relatedly, insofar as the majority contends that the dissents disregard the statute's language or intent, it presumes the correctness of its own interpretation, thus committing the logical fallacy of using a premise to support itself. Finally, the majority contends that if the legislature intended to require ADWR to consider federal reserved water rights in assessing legal availability, it failed to do so in § 45-108. *Supra* ¶ 44. Thus, the majority says it will not apply the statute by its terms even if doing so would further the legislature's intent, and this approach respects the proper role of the courts. *Id.* I disagree.

**¶56** Finally, deferring to ADWR's interpretation of its rule seems contrary to the legislature's recent amendments to A.R.S. § 12-910, which directs:

> In a proceeding brought by or against the regulated party, the court shall decide all questions of law, including the interpretation of a constitutional or statutory provision or a rule adopted by an agency, without deference to any previous determination that may have been made on the question by the agency. Notwithstanding any other law, this subsection applies in any action for judicial review of any agency action that is authorized by law.

2018 Ariz. Sess. Laws, ch. 180, § 1 (2d Reg. Sess.) (to be codified at A.R.S. § 12-910(E)) (effective Aug. 3, 2018).

**¶57** Noting that this statute concerns judicial deference to agency interpretations rather than the "prior construction" canon, *supra* ¶ 28, the majority misses the deeper point. If it is objectionable to cede the power to interpret statutes or rules to an agency, isn't it even more objectionable to cede to an agency – as the majority effectively does – the very power to pass statutes by inferring, from legislative silence, an intent to enact preexisting agency regulations? Based on the "prior construction" canon, one might reasonably conclude that if courts have authoritatively interpreted a particular term (e.g., "special weight" or "creditors"), the term has the same meaning when later adopted in a statute concerning the same subject. *See, e.g.*, *In re Marriage of Friedman & Roels*, 244 Ariz. 111, 115 ¶ 14, 116 ¶ 20 (2018); *Moore v. Chilson*, 26 Ariz. 244, 254 (1924). It is an entirely different

proposition, however, to contend that the legislature by enacting a statutory standard (e.g., the requirement of "legal availability") has implicitly codified a pre-existing body of detailed agency rules. Doing so combines deference and delegation with a vengeance.

## II.

**¶58**      Just as an administrative agency cannot exceed its delegated powers, it cannot shirk its delegated responsibilities. *See Kendall v. Malcolm*, 98 Ariz. 329, 334 (1965) (noting that "[t]he powers and duties of an administrative agency are to be measured by the statute creating them"). The legislature here has directed that ADWR evaluate a proposed subdivision's 100-year adequate water supply. Whereas ADWR's physical availability regulation fulfills its statutory duty to assess a landowner's prospective ability to access groundwater, the legal availability regulation fails to reasonably assess whether a landowner would have legal access to an adequate water supply 100 years in the future. ADWR cannot fulfill its delegated responsibility without considering the SPRNCA's federal reserved water rights here.

**¶59**      "[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert*, 426 U.S. at 138; *see also Winters v. United States*, 207 U.S. 564 (1908). "The implied-reservation-of-water-rights doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert*, 426 U.S. at 140. Because the reserved rights doctrine is based on the "necessity of water for the purpose of the federal reservation," the federal government can protect its water "from subsequent diversion, whether the diversion is of surface or groundwater." *Id.* at 143; *see also Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1270 (9th Cir. 2017). Given that federal water rights "are not dependent upon state law or state procedures[,] they need not be adjudicated only in state courts; federal courts have [concurrent] jurisdiction under 28 U.S.C. § 1345 to adjudicate the water rights claims of the United States." *Cappaert*, 426 U.S. at 145.

¶60 This Court has recognized the reserved water rights doctrine and the primacy of federal law when examining federal water rights in state court. *See In re the General Adjudication of All Rights to Use Water in the Gila River Syst. and Source* (*Gila III*), 195 Ariz. 411 (1999). "[I]n order to adjudicate and quantify water rights based upon federal law, the Arizona courts must afford federal claimants the benefit, when state and federal law conflict, of federal substantive law." *Id.* at 416 ¶ 13. This Court "may not defer to state law where to do so would defeat federal water rights." *Id.* at 419 ¶ 27.

¶61 Although Arizona law still adheres to the legal fiction that surface water is hydrologically separate from groundwater, "upon evidence that 'federal [surface] water rights [are] being depleted by groundwater pumping because . . . groundwater and surface water are physically interrelated,'" the federal government can protect its rights from subsequent groundwater diversion. *Gila III*, 195 Ariz. at 418 ¶ 20 (quoting *Cappaert*, 426 U.S. at 142-43). Thus, the "significant question of the purpose of the reserved rights doctrine is not whether the water runs above or below ground but whether it is necessary to accomplish the purpose of the reservation." *Id.* at 419 ¶ 24.

¶62 Here, Congress created the conservation area to "protect the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River in Cochise County, Arizona." 16 U.S.C. § 460xx(a). Congress's reservation of water rights was explicit:

> Congress reserves for the purposes of this reservation, a quantity of water sufficient to fulfill the purposes of the San Pedro Riparian National Conservation Area created by this subchapter. The priority date of such reserve rights shall be November 18, 1988. The Secretary shall file a claim for the quantification of such rights in an appropriate stream adjudication.

*Id.* § 460xx-1(d). The federal government's claimed water rights for the conservation area incorporate a surface water instream flow component, point sources such as ponds, springs, and wells, and a groundwater elevation component. BLM contends that all these rights are essential to maintaining the riparian area's surface flows and vegetation.

¶63        Congress's reservation of water rights for the conservation area is robust.  But the subwatershed in which the conservation area is located is strained.  The United States Geological Survey ("USGS") has found that the "[l]ong-term sustainability of [the San Pedro] riparian system is directly dependent on base flow and shallow near-stream ground-water levels."  Stanley A. Leake, Donald R. Pool & James M. Leenhouts, U.S. Geological Survey, *Simulated Effects of Ground-Water Withdrawals and Artificial Recharge on Discharge to Streams, Springs, and Riparian Vegetation in the Sierra Vista Subwatershed of the Upper San Pedro Basin, Southeastern Arizona* 1 (version 1.1 Apr. 2014).

¶64        This Court has already found that "[u]nder the 'reasonable use' doctrine, Arizona has consumed far more groundwater than nature can replenish."  *Gila III*, 195 Ariz. at 420 ¶ 30.  Moreover, ADWR has presented evidence to this Court in other proceedings regarding the diminishing water flows in the San Pedro and Upper San Pedro watersheds.  *See id.*  Indeed, the USGS has found that "ground-water levels in parts of the subwatershed are declining . . . [and t]he continued decline of ground-water levels upgradient from perennial river reaches will eventually diminish the base flow of the San Pedro River and imperil the riparian ecosystem within the SPRNCA."  *See* Leake et al., *supra* ¶ 63, at 2.

¶65        Such hydrologic realities confirm that Pueblo's proposed increase in groundwater pumping could potentially conflict with the SPRNCA's federal reserved water rights.  Therefore, ADWR cannot determine that Pueblo will have "legally available" water without evaluating whether the federal reserved rights will limit the subdivision's projected use.  To be sure, directing ADWR to fulfill its statutory responsibilities does not determine whether the permit at issue should be approved.  But ADWR should consider the SPRNCA's water rights before it grants Pueblo an adequate water supply designation.

### III.

¶66        Pueblo and ADWR argue, and the majority agrees, that consideration of unadjudicated rights is impermissibly speculative.  *Supra* ¶¶ 32, 34, 36.  They reason that ADWR will be forced to make several assumptions regarding the purposes of the reservation, whether those purposes require water, whether water supplies other than groundwater

will be sufficient, whether there is a causal connection between groundwater pumping and adverse impacts to the reservation, and even whether BLM would seek to enforce its rights. But many of these "assumptions" have already been established. BLM has repeatedly sought to protect and enforce its water rights, as evidenced by its claims in the Gila Adjudication and its litigation here. Furthermore, the conservation area's purposes, reserved water rights, and priority date have already been established by federal law. *See* 16 U.S.C. §§ 460xx, 460xx-1.

¶67 ADWR – our state's department of *water resources* – has the expertise and resources necessary to analyze the physical interactions of water withdrawals and the legal interactions between water rights. *See, e.g.*, A.R.S. § 45-105(A)(1)-(4). The consideration of the SPRNCA's unadjudicated water rights would be no more speculative than many of the calculations and estimations ADWR already makes in its 100-year adequate water supply evaluation. Given the degree of speculation attendant to any evaluation of a 100-year water supply, the fact that the SPRNCA's reserved rights are not yet quantified does not justify ADWR abdicating its statutory responsibility. ADWR, as the state agency empowered to "[m]easure, survey and investigate the water resources of this state," A.R.S. § 45-105(A)(4), could conduct a hydrological study to determine whether Pueblo's proposed increase in groundwater pumping, when combined with existing groundwater pumping in the watershed, would infringe the SPRNCA's federal reserved water rights so as to defeat the purpose of the conservation area.

¶68 Pueblo and ADWR next argue that it would be inappropriate for ADWR to consider BLM's unquantified federal water rights because ADWR currently serves as a technical advisor to the Gila Adjudication, where BLM's rights are being litigated. Pueblo claims that this "dual role" as technical advisor and adjudicator would create separation of powers and due process concerns. Pueblo misapprehends the legal availability analysis. ADWR is not required to conclusively quantify the conservation area's water rights in assessing whether water will be legally available for Pueblo's proposed development. Instead, it must only consider the potential impact that Pueblo's groundwater pumping will have on the SPRNCA's water rights. Any calculations ADWR would make regarding those rights, including any impact of Pueblo's proposed pumping, would

have no precedential effect and would not usurp the Gila Adjudication's judicial authority.

¶69        The majority prioritizes the interests of subdivision developers over those of homeowners, observing that the "stakes of this speculative process would be exceedingly high, given that a finding of inadequate water supply precludes development." *Supra* ¶ 32. But the potential harm suffered by homeowners would be even higher if their property is one day rendered almost worthless due to an inadequate water supply.

## IV.

¶70        Trial to quantify the conservation area's water rights is currently set to begin on January 28, 2019. *See In re San Pedro Riparian National Conservation Area*, Contested Case No. W1-11-232, Scheduling Order, Maricopa County Superior Court (June 15, 2018). At oral argument, ADWR conceded that it could consider quantified federal reserved water rights in its legal availability analysis, but that it would do so only if "the federal government could prove, likely through an injunction, that an applicant's prospective groundwater pumping would infringe upon that right." *Supra* ¶ 43. The majority seems to agree, summarily concluding that "only an injunction based on a federal reserved water right could legally inhibit Pueblo's right to pump." *Supra* ¶ 36. This approach threatens to undermine both § 45-108 and the reserved rights Congress recognized for the SPRNCA.

¶71        Problematically, the majority misapprehends the relationship between our prior case law and ADWR's granting an adequate water supply designation. The majority cites *Gila III* for the proposition that our caselaw "disfavors consideration of unquantified federal reserved water rights." *Supra* ¶ 33. To be sure, *Gila III* described as premature the tribes' argument to "immediately enjoin pumping that is depleting water beneath reservations" because, "[u]ntil federal rights are quantified, it cannot be determined which if any of the tribes are entitled to such relief." 195 Ariz. at 421 ¶ 35 n.12. But those comments, made in proceedings seeking injunctive relief, are inapposite here. Requiring ADWR to consider federal water rights in making an adequate water supply determination does not require the water rights to be finally adjudicated.

**¶72** Essentially, the majority would allow ADWR to ignore the legal inadequacy of a proposed water supply until the problem becomes a reality. This interpretation defeats the adequate water supply provision's manifest purpose to proactively protect consumers in Arizona *before* they purchase property. The plain text of § 45-108(I) requires ADWR to prospectively evaluate a 100-year water supply, and not merely to evaluate what has already happened. Moreover, this interpretation could also damage the federally protected ecosystem by allowing diminishment of the base flow and groundwater levels. Although a zero-impact standard would likely not be appropriate, *see Gila III*, 195 Ariz. at 422 ¶ 38, groundwater users in the area with inferior water rights should not bring the conservation area's wildlife populations and aquatic environments to the brink of collapse before the federal government can enforce its rights.

## V.

**¶73** Directing ADWR to consider the possible impact of the existing federal rights on the availability of water for the proposed subdivision comports with the language and purpose of § 45-108. Such consideration does not inherently involve any greater uncertainty or speculation than the other projections ADWR must make for a 100-year availability determination. Accordingly, with due respect for my colleagues, I would affirm the superior court's ruling.

BOLICK, J., joined by PELANDER, J., concurring in part and dissenting in part.

¶74        This case raises the meaning of the statutory command that the Director determine whether sufficient water "will be . . . legally . . . available to satisfy the water needs of the proposed use for at least one hundred years."  A.R.S. § 45-108(I)(1).  Because the majority's construction renders that command essentially meaningless, I respectfully dissent from that portion of the opinion.

¶75        Our task here implicates multiple canons of statutory interpretation, of which the majority hitches its outcome to mainly one.  The first relevant principle is the presumption against ineffectiveness, which holds that a textually permissible interpretation that furthers rather than obstructs the statute's purpose should be favored.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012).  As Scalia and Garner explain, "This canon follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness." *Id.*  Here, although we do not know from the text exactly what a determination of legal availability entails, we do know that such a determination is required.  From the language and context, the evident purpose is to protect consumers against purchasing homes for which water supply may be insufficient.  As a cardinal principle of statutory interpretation, we should favor an interpretation that gives substantive meaning to the statutory command rather than one that defeats or diminishes its evident purpose.

¶76        A second and related principle is the surplusage canon, which holds that if possible, "every word and every provision is to be given effect," and that "it is no more the court's function to revise by subtraction than by addition." *Id.* at 174.  Scalia and Garner observe that "this canon prevents not [only] the total disregard of a provision, but an interpretation that renders it pointless." *Id.* at 176.  As the Chief Justice points out, that is exactly what the majority does here. *See supra* ¶ 53.

¶77        The majority decision rests largely on a third principle, the prior-construction canon, which holds that where a term is undefined, the legislature is deemed to have adopted a preexisting interpretation by,

among other entities, an administrative agency. *Supra* ¶¶ 22–28. Here, the Arizona Department of Water Resources ("ADWR") had a preexisting regulation defining legal availability, and the majority assumes that by its definitional silence, the legislature implicitly adopted it.

¶78        The canon's legal foundation is solid and its application here is intuitively appealing. But where, as here, it collides with other fundamental interpretive principles, its application should be carefully considered.

¶79        As a threshold question, we should ask how far this principle logically extends. For instance, if the agency had issued a preexisting rule saying the Director should determine legal availability by eating a jelly sandwich, surely we would not apply that definition even if the legislature subsequently adopted the legal availability terminology without defining it. So too should we not adopt the preexisting agency definition here if it is inconsistent with the subsequent legislative enactment, given that agency authority derives entirely from express legislative delegation. *See, e.g.*, *Ariz. State Bd. of Regents ex rel. Ariz. State Univ. v. Ariz. State Pers. Bd.*, 195 Ariz. 173, 175 ¶ 9 (1999) (noting administrative agencies have no "inherent powers" but only those derived from legislative delegation); *R.L. Augustine Constr. Co. v. Peoria Unified Sch. Dist. No. 11*, 188 Ariz. 368, 370 (1997) (agency rule must be "substantially consistent" with the statute).

¶80        The lack of any meaningful connection between the statutory command to determine legal availability and the substance of ADWR's regulation renders the agency's definition untenable. To determine legal availability, ADWR's regulation requires only one thing: that the applicant has secured a certificate of convenience and necessity ("CC&N") from the Arizona Corporation Commission. Ariz. Admin. Code R12-15-718(C). The Commission has no jurisdiction over water. Its authority to grant CC&Ns applies generically to public service corporations constructing any "street railroad, [] line, plant, service or system." A.R.S. § 40-281(A). The CC&N process entails no analysis whatsoever of water supply. Obtaining a CC&N tells us absolutely nothing about the legal availability of water for a single

day much less for the next hundred years.[6] That is especially true here, where the CC&N was obtained forty-six years ago, before either ADWR's regulation or the statute requiring a legal availability determination. The majority notes that the Commission could order construction of additional facilities in the public interest, *supra* ¶ 30, but again, that has nothing to do with legal availability. Obtaining a CC&N is thus completely unrelated to determining legal availability and would be highly unlikely to survive challenge had ADWR adopted it to implement the statutory command to determine legal availability. We therefore should not impute to the legislature an intent to define the statutory command in this manner, particularly when by so doing we would drain that command of any meaningful content.

**¶81** Moreover, the statutory command to determine legal availability is directed to "the director of water resources," § 45-108(B), (I)(1), suggesting that the legislature, in fact, meant for the Director to conduct the analysis, and not to outsource it to another agency. Ironically, in one breath, ADWR argues that the statute cannot mean what it says because it lacks the expertise to project legal availability; while in the next, it urges us to accept a CC&N issued by the Arizona Corporation Commission before ADWR's regulation was even adopted as compliance with the statutory command.

**¶82** Further, as the Chief Justice observes, *supra* ¶ 56, the legislature itself recently has categorically instructed that with regard to statutory interpretation, we should provide *no* deference "to any previous determination that may have been made on the question by the agency." A.R.S. § 12-910(E); *see* 2018 Ariz. Sess. Laws, ch. 180, § 1 (2d Reg. Sess.) (effective Aug. 3, 2018).[7] ADWR's definition of legal availability is a "previous determination . . . on the question by the agency" and therefore we should give it no weight. Whatever continuing vitality, if any, the prior-construction canon has in Arizona with regard to agency interpretations or

---

[6] ADWR says it also requires that the applicant must show it has the right to a reasonable and beneficial use of the water, A.R.S. § 45-453, but that determination likewise suggests nothing about future legal availability.

[7] I regret that the majority has seen fit to apply a limiting interpretation to this statute before its ink is barely dry.

definitions, it must yield to enforcement of the statute's language and context and the evident purpose that we derive from it.

**¶83** The majority thwarts that purpose, creating a Swiss cheese statute with robust obligations on either side and a hole in the middle. As the majority describes it, ADWR's process to determine physical availability is rigorous, requiring among other things, a hydrology study and independent determination that the groundwater will be drawn from certain wells and at certain depths, taking into account projected declines in water level caused by existing uses. *Supra* ¶ 17; *see also Silver v. Pueblo Del Sol Water Co.*, 241 Ariz. 131, 141 ¶ 32 (App. 2016) (Analysis entailed "consideration of the water already committed to approximately 200 area users."). Similarly, the obligation that the applicant demonstrate financial capability to construct the water facilities, including a delivery system and any storage facility or treatment works, § 45-108(I)(2), is substantial on its face. It would be incongruous for the legislature, in a list of prerequisites, to include two that relate directly and substantively to the provision of water supply and another that seems to on its face but in reality does not.

**¶84** The majority's interpretation similarly frustrates the statute's evident consumer protection purpose. It tries to assure us otherwise but fails. First, it points back at the very statute it has eviscerated to show that it "provides consumers with vigorous protections against unscrupulous developers,"[8] *supra* ¶ 39—but of course now *without* meaningful analysis that water will be legally available. Then it notes that ADWR can revoke its availability determination, which of course is cold comfort to homeowners who purchase homes in reliance on that determination, especially when coupled with the fact that if the agency does so, "consumers have no recourse against the state, the Director, or ADWR." *Supra* ¶ 40 (citing A.R.S. § 45-108(G)). The majority acknowledges that the

---

[8] From its language and context, the requirements of § 45-108 appear primarily aimed not at "unscrupulous developers," for it provides no cause of action against them, but rather at ensuring a balanced, objective, independent, good-faith analysis that our state's most scarce and precious commodity will likely be available for the extended future to those who make a major investment in a home purchase. The statute provides absolutely no guarantees or warranties, except that such an analysis will in fact take place.

legislature could require a "comprehensive assessment of the potential impact of unquantified federal reserved water rights based upon speculative projections about litigation outcomes years or decades in the future." *Supra* ¶ 42. Of course, speculation is inherent in any projection regarding water availability, legal or otherwise, "for at least one hundred years," but that is exactly what the statute commands. § 45-108(I)(1).

**¶85** Any analysis of legal availability necessarily includes known competing claims, even if they are not finally adjudicated. No one would purchase a residence that was subject to eminent domain proceedings, even if they were incomplete. The legislature plainly wanted ADWR to provide an analysis, as best it can given the inherent uncertainty, of the projected water supply's future legal availability. Certainly, that is a more logical inference than that the legislature wanted the developer to obtain a CC&N from the Arizona Corporation Commission. If it did, it surely employed an odd term ("legal availability") to accomplish that purpose.

**¶86** To recap: no legal availability determination was made in this case; no meaningful legal availability determination will be made in future cases; and consumers have no recourse under these statutes even if it would have been clearly foreseeable to ADWR that the water supply would not be legally available for the next hundred years. That could not have been what the legislature intended when it included legal availability within the requisite tripartite analysis. We can either read the obligation, in light of its plain language and evident purpose, to mean exactly what it says, or we can read it to mean essentially nothing. I opt for the former not because I prefer that policy result, but on the ground that we should never presume that the people's elected representatives meant to accomplish nothing when they enacted a statutory provision.

**¶87** I agree with the Chief Justice that ADWR's projection is not a predetermination of legal rights, has no precedential effect, and does not usurp the Gila Adjudication's judicial authority. *Supra* ¶ 68. The majority creates a straw man by suggesting that the dissenters would rewrite the statute, *supra* ¶ 44, to "mandate[] a moratorium on development in the absence of an absolute certainty of a future water supply." *Supra* ¶ 40. Quite to the contrary, our interpretation would enforce the statute as written, which in my view contemplates nothing more than a nonbinding

analysis. The determination required of ADWR does not require exactitude; indeed, by its explicit terms, all it requires is good faith. § 45-108(G). By contrast, the majority's interpretation largely erases the statutory requirement, which absent a constitutional infirmity that is not suggested here, we are not empowered to do.

¶88 The legislature has justifiably reposed great confidence and responsibility in ADWR. We should effectuate its decision to do so. With great respect to my colleagues, I dissent.

PELANDER, J., concurring in the partial dissents.

¶89　　　　This is a close and important case, with good arguments on both sides.　I join the Chief Justice's partial dissent because, viewed in context and in light of the statute's undisputed consumer-protection purpose, the phrase "legally available" in A.R.S. § 45-108(I)(1) is not ambiguous; therefore, ADWR's mandatory evaluation and determination under § 45-108(B) must include its consideration of federal reserved water rights.　Given that unambiguity, I find persuasive the Chief Justice's reasoning and conclusion.

¶90　　　　But assuming the reference to "legally available" in § 45-108(I)(1) is ambiguous, as the majority concludes and Justice Bolick implies, I agree with the analysis and conclusion in Justice Bolick's partial dissent.　Among other things, I find illogical the notion that issuance to Pueblo of a CC&N by the Arizona Corporation Commission nearly a half-century ago ipso facto satisfies the mandatory duty owed by ADWR now, decades later, to "evaluate" and "determine whether there is an adequate water supply for the subdivision."　§ 45-108(B).　That premise seems particularly unfounded inasmuch as any development, let alone one the magnitude of "Tribute," was neither contemplated nor planned until long after the CC&N was issued in 1972.

¶91　　　　Because the statutory interpretation issues here are of statewide interest and importance, the legislature should carefully and promptly consider the parties' arguments and our differing opinions.　If the majority has it wrong, statutory clarification would be helpful to developers, consumers, water companies, ADWR, and many other entities and persons who care about and are affected by water issues in this state.